## LAW *vs.* CROSS.

1. An agent may sue his principal in his own name on the contract by which he was employed, though he be a member of a mercantile house through which the correspondence necessary in the transaction of the business was carried on.

2 The partners of the agent would not be parties to his contract with his principal, even if he agreed to make them sharers in the profits of it.

3. It is not erroneous for a judge of the Circuit Court to disregard the written points of counsel and charge the jury in his own way, if he submits the facts fairly and gives his opinion fully on every question of law arising in the case.

4. Where an agent goes beyond the letter of his instructions, the principal must within a reasonable time repudiate the act, or else be bound by his acquiescence.

5. The customary meaning of a word among merchants is a matter of fact for the jury to decide upon evidence.

6. A letter written by the master of a vessel to an agent of the owner, advising what shall be done for the owner's interest in an emergency created in part by the act of the master himself, which advice was followed by the agent to whom it is addressed, may be given in evidence as part of the *res gestae.*

7. Where an agent buys an article for his principal and the price goes down, another agent of the same principal has no authority to repudiate the contract unless specially directed to do so.

Writ of error to the Circuit Court of the United States for the southern district of New York.

This was assumpsit brought in the Circuit Court by Alexander Cross, a subject of the British Queen, against George Law. The declaration (or complaint) contained the common counts, which the defendant answered with the plea of *non-assumpsit* and a notice of set-off.

It appeared on the trial that Law, the defendant, established a line of steamers to run between Panama and San Francisco. The line was composed of the *Isthmus,* the *Republic,* the *Columbus,* and the *Antelope,* which left New York to take their places

in the line at different times, in the spring of the year 1850. The defendant employed Cross, the plaintiff, as his agent to make purchases of coals for the use of these ships. He (the plaintiff) was a member of a firm consisting of himself and four others, who were engaged in trade at· Valparaiso, under the name of Cross, Hobson & Co., and at San Francisco under the name of Cross & Co. The defendant addressed his letters uniformly to Alexander Cross, but they were answered in the name of Cross, Hobson & Co.

The plaintiff made several purchases of coals for the defendant's ships under, and, as he alleged, agreeably to the special orders of the defendant. But for some of those purchases the defendant denied his liability to pay, averring that his directions concerning them had been disregarded and violated.

When the Antelope was about to sail for the Pacific, the defendant advised Cross of the fact, and directed him to purchase for her 350 tons of good coal *at Valparaiso*, and draw for the price.· This was repeated twice afterwards. The plaintiff advised the defendant promptly that coal was scarce at Valparaiso, but he had purchased a lot for the Antelope at the fine port of Coquimbo, one day's sail further north. The coal was kept at Coquimbo, ready to supply the Antelope when she would come. But she arrived at Valparaiso, long after she was expected, in a crippled condition, and was obliged to stop there for repairs. The master, by way of saving time, thought it best to buy other coals at Valparaiso, where they could be put on board while the repairs were in progress. Being so supplied, he recommended that the coals purchased by Cross at Coquimbo should be sent to San Francisco. This advice was adopted, the coals were shipped for San Francisco, at a freight of $17 per ton, and the defendant was informed of the whole transaction, without delay.

The defendant also directed the plaintiff to purchase two cargoes of coal *afloat*, and send them to San Francisco as soon as possible. Within four days after the receipt of this order, the plaintiff answered that the order had been filled by the purchase of 500 tons, the cargo of the *Lady Lilford*, to be delivered by that vessel at San Francisco; and 444 tons more, the

cargo of the *Duncan,* which was then at sea, with the right to cancel the contract if she failed to arrive in sixty days. Full details as to prices and freight accompanied this communication. The cargo of the Lady Lilford was duly delivered at San Francisco, received and paid for. The Duncan arrived within the stipulated time, but her master being unwilling to carry the coals further, they were shipped on board two other vessels. The *Charles V.* took 350 tons, and the balance, together with the 300 tons at Coquimbo, went by the *Amelia.* Oliver Charlick, the general agent of the defendant at San Francisco, refused to accept the coals brought by the two last named vessels, and after various delays and much negotiation, they were sold at auction for whom it might concern.

The plaintiff's claim was for the price of the cargo bought at Coquimbo for the Antelope, the price of the Duncan's cargo bought for the general purposes of Law's line, with the freights, duties, expenses, and commissions, less the amount of the sales at San Francisco.

After the evidence was closed the defendant's counsel divided the law of the case into twenty-eight points, and requested the court to instruct the jury on each of them. Mr. Justice *Nelson,* who presided at the trial, gave his opinion of the legal principles involved without reference to this request. The substance of the charge, omitting details, and briefly stated, was this:

1. Cross had a right to sustain this action in his own name, though he was the partner of others, who did some or all of the business; because the contract was made by the defendant with Cross alone, and the correspondence showed that the defendant never recognised anybody but him as being concerned.

2. It was a question for the jury to determine whether the purchase of the Duncan's cargo, while the vessel was still at sea, was a purchase of coal *afloat* in the proper sense of the word as used in the defendant's order, but in the opinion of the judge it could make no substantial difference whether the contract was before or after the arrival of the vessel at the port of Valparaiso.

3. Whether the plaintiff's purchase of coal at Coquimbo for the Antelope was within the order to buy it at Valparaiso, so as to make the defendant responsible for the price of it, might be doubtful, under the peculiar circumstances of the case; but the shipping of that coal to San Francisco was undoubtedly beyond the authority given to the plaintiff; and the advice of Captain Hackley, the master of the Antelope, that it should be sent there, did not help the matter. But,

4. If the defendant was informed that his agent had, on his own judgment, departed from his instructions, he (the principal) was bound, within a reasonable time, to advise the agent that he did not mean to ratify his acts. Otherwise, he must be taken to have acquiesced in what was done, and was concluded from disputing the agent's authority. This rule, the judge said, was essential to secure just dealing between principal and agent, but whether this case came within its operation was a question of fact for the jury.

5. No authority to Charlick, the defendant's agent at San Francisco, had been shown, which made his repudiation of Cross's acts equivalent to a repudiation by Law, the common principal of both; but if specific authority to that effect had been given, it would be sufficient.

Under these instructions the jury found a verdict in favor of the plaintiff for $15,933 79, on which the court gave judgment, and the defendant took this writ of error.

*Mr. S. D. Law,* of New York, and *Mr. Gillet,* of Washington city, for the plaintiff in error.

*Mr. Lane,* of New York, for defendant in error.

Mr. Justice GRIER. The objection that this suit should have been brought in the name of Cross, Hobson & Company, instead of Alexander Cross, has no support, either in law or the facts in evidence. The contract on which the suit was brought was with Cross alone. Law had established a line of steamers on the Pacific, to run from Panama to San Francisco. It became necessary to supply them with coal at Valparaiso,

and to have purchases of it made there, in expectation of their arrival round the cape, and for supplies at San Francisco.

Cross being in New York in January, 1850, and about to go to Valparaiso, was employed by Law to make purchases of coal for him at Valparaiso. His letters of instruction are all directed to Cross alone, and contain no intimation of any other party in the transaction. Cross was a member of the mercantile firm of Cross, Hobson & Co., doing business in Valparaiso. The same firm had a house also in San Francisco. Through these houses much of the correspondence necessary in the transaction of the business was carried on. That Cross was a member of each of these firms, was but an accident in the case, and would not necessarily make them parties to the contract more than if any other individual or firm had been his agents; and even if Cross had agreed to make them equal shares in the profits arising from the contract, they did not thereby become parties to it. The firm had no contract with Law on which they could sustain a suit, or be liable to him. Much stress was made in the argument of this case, that the firm, in their correspondence with Law, giving information of what had been done, used the words "*we*" and "*us*." There was certainly no grammatical impropriety in the use of these pronouns; but the inference that the firm were not acting for Mr. Cross, and that Law had made some contract with them which does not otherwise appear, is certainly not a necessary one either in law or in fact. Every letter of instruction as to purchase of coal was sent by Law to Cross individually. His letter of instruction also to the master of the Antelope directs a consignment of the vessel to Cross, and not to the firm. The letters of credit were to Cross alone, on the faith of which he alone could draw bills to make the necessary payments.

A congeries of instructions, so called, amounting to the number of twenty-eight, were requested. The court, without confusing the jury with a special answer to each one of these propositions, properly submitted the facts to the jury, and gave them instructions as to the law. A large number of

these points, which involve questions of law, were ruled in the charge as requested by the counsel.

The case was argued here, in some measure, as if it had been an appeal in admiralty, or motion for a new trial.

To comment on all the objections attempted to be raised in the case would be tedious and unprofitable. It will be sufficient to notice the real questions in the case, and the instructions given by the court. If these were correct, the court below were not bound to answer specifically each question in the catechism, nor this court to comment thereon.

I. As to the cargo of the Duncan, it was objected that there was no authority to the agent to make such purchase.

The defendant had, by his letter of May 28, 1850, instructed the plaintiff as follows:

"I want you to purchase me two cargoes of coal afloat, and send it to San Francisco as soon as possible; consign it to your house there for me," &c. This cargo was purchased on its way to Valparaiso, with an option to refuse it if it should not arrive in sixty days. The coal afterwards arrived, but the master of the vessel refused to take it to San Francisco, and another vessel was chartered to take it. There was some dispute as to what was meant by the term "*afloat*," and testimony was given as to its meaning among merchants.

The court submitted the question to the jury.

We can discover no error in this instruction.

II. As to the coal purchased at Coquimbo, and afterwards sent to San Francisco by the Amelia, Law had instructed Cross to buy 350 tons of coal at Valparaiso for the Antelope, which was expected to arrive at Valparaiso by the first of June; but she did not arrive till 28th of August, in consequence of delay in starting and detention on the way. In July Cross wrote to Law that he had purchased the coal for the Antelope, not at Valparaiso, but at Coquimbo, stating as a reason that coal was scarce and difficult to procure, and he was fearful the vessel might arrive and not find a supply, and Coquimbo was but a day's sail further on the way, the coal cheaper, and a safer and easier place to ship it. But when the Antelope arrived after-

wards, she was so much disabled as to require repairs, and being delayed at Valparaiso for that purpose, the master preferred to have other coal purchased at Valparaiso, which could be put on board while his vessel was being repaired, and directed the coal at Coquimbo to be sent to San Francisco.

The defendant objected that this purchase was not within his instructions.

It presented a case where the agent, acting, as he supposed, for the best interest of his distant principal, under the circumstances, had nevertheless gone beyond the letter of his instructions. But, as the coal was purchased for the principal, it belonged to him if he chose to accept it. If the price had risen, and Cross had sold it, Law might justly have claimed the profit; and when informed by his agent of what he had done, if the principal did not choose to affirm the act, it was his duty to give immediate information of his repudiation. He cannot, by holding his peace, and apparent acquiescence, have the benefit of the contract if it should afterwards turn out to be profitable, and retain a right to repudiate if otherwise.

The principal must, therefore, when informed, reject within a reasonable time, or be deemed to adopt by acquiescence. The rule is said to be a "stringent one upon the principal in such cases, where, with full knowledge of the acts of the agent, he receives a benefit from them, and fails to repudiate the acts." See *Hoyt* vs. *Thompson*, (19 N. Y., 218.)

Whether there was such acquiescence or not the judge left fairly to the jury.

III. The letter of Hackley was part of the *res gesta*, and properly admitted. The court instructed the jury that Mr. Law was bound by his advice or direction, because it was outside of his authority. The defendant cannot complain of this instruction.

IV. On the arrival of this coal at San Francisco the price of coal had fallen, and it became the interest of Law to have the loss thrown on Cross. Accordingly, Charlick, Law's agent to attend to his steamboats on the Pacific, assumed the power of repudiating the contract, and set up as a pretence that the coal was not good. As he refused to receive it, the coal was

*Law* vs. *Cross.*

consequently sold for the benefit of whom it might concern, and bid in by Charlick for a sum which paid the freight only, leaving the price paid for the coal by Cross unpaid.

The court properly instructed the jury that the authority of Charlick, as shown, was not such as to authorize him to repudiate the purchase, leaving it to the jury to say, from the evidence, whether the defendant had communicated to Charlick any specific authority to reject the coal, and also whether the coal was of proper quality or not, and what was the contract, or whether there was any parole contract between Cross and Charlick.

There can be no error imputed to this instruction, except that the jury were left to presume a private instruction to Charlick, of which there was no evidence. But plaintiff in error cannot complain of errors in his favor.

These are all the material points in the case that were properly raised on the trial below, and it is not necessary to vindicate our decision by a more minute examination of the facts. The court below has given correct instructions as to the questions of law really involved in the case, and properly refused to confuse the case by a specific answer to each of the twenty-eight points. Those not answered in the instructions we have noticed were either answered affirmatively or were wholly irrelevant.

*Judgment of the Circuit Court affirmed.*