THE UNION BANK in the City of New York *vs.* GARRET
S. MOTT.

An agent acting under a general power of attorney, giving him power to draw
or indorse checks for and in the name of his principal, has no authority
to overdraw his principal's account at the bank.

And if over-drafts are made upon such account, by the agent, through a frau-
dulent collusion with a book-keeper in the bank, without the knowledge or
sanction of the principal, who receives no part of the proceeds, the loss
must fall upon the bank; such loss having been occasioned by the fraud
of its own clerk and servant, in the performance of his duties in the bank.

The bank must look for redress to its book-keeper, and his sureties, and to
those who participated in the frauds.

A plaintiff having proved the existence of a written dissolution of a part-
nership, in 1854, called M. as a witness, to produce that paper. M. denied
having it, and denied its existence. He then, on cross-examination, swore
that the firm was dissolved in 1844 or 1845. *Held* that this was an affirm-
ative and independent fact, and could not be upheld as a cross-examina-
tion; there being nothing to cross-examine about.

THIS is an appeal from a judgment entered upon the re-
port of a referee in favor of the defendant. The action
was originally against Jacob H. Mott as a co-defendant, but
he died prior to the report of the referee, and the suit has
since been continued against Garret S. Mott alone. The
plaintiff claims to recover $97,254.90 of alleged overdrafts,
drawn upon and paid by it to the defendant, through his
agent, J. H. Mott. On the 11th September, 1845, the de-
fendant executed under his seal, and delivered to J. H. Mott,
a power of attorney whereby he authorized him to collect
and receive all moneys due the defendant from any one " and
to indorse any notes or drafts in my favor, and to attend to
any and all business in which I am interested or concerned,
and to draw or indorse checks for me, and in my name ;"
giving him full power in the premises, as if he (the defend-
ant) were personally present; which power of attorney was
then lodged with the bank, where it has since remained. It
appeared on the trial, that from 1849 to January, 1853, in-
clusive, the amount claimed was overdrawn from the bank on

checks drawn by J. H. Mott and signed in the name of the defendant, with " J. H. Mott, attorney," written thereunder. It was also claimed that the defendant had himself over-drawn to the amount of $2004, and that in any event the plaintiff was entitled to recover that sum and interest, and that the referee erred in not finding that fact.   It also appeared that these over-drafts were accomplished by fraud-ulent collusion with one Brotherson, a book-keeper of the plaintiff, in the bank, who entered in the books of the plaintiff false credits to the defendant.   The deposits were generally made and the checks usually drawn by the agent. The referee found that the defendant did not authorize the over-drafts, had no knowledge or notice of them, and that no part of the proceeds was received by him or to his use.

*S. A. Foot,* for the plaintiffs and appellants.   .

*D. D. Field,* for the respondent.

*By the Court,* PECKHAM, J.   The agent here was em-powered to collect the money due the principal, and to draw or indorse his checks.   Did this authorize him to over-draw ?

A check is defined to be " a written order or request to a bank by a party having money there, to pay, on present-ment, to another, or to him or bearer, or to him or order, a certain sum of money specified in the instrument." (*Story on Promissory Notes,* § 487.)   " They are always supposed to be drawn upon a previous deposit of funds, and are an absolute appropriation of so much money in the hands of the bank or bankers, to the holder of the check. (*Same,* § 489.) The purpose of this power of attorney seems to be to give the agent power to collect the debts of the defendant, and also to draw out his money from the bank ; and the power authorized the bank to pay out the defendant's money on such checks, and stated that they would be regarded by the

defendant as good vouchers for his money so paid out by the
plaintiff.   But it does not seem to me to give any intima-
tion that the defendant thereby authorized the agent to over-
draw.   Borrowing money from the plaintiff by such checks
does not appear to be a purpose of the defendant.   It was
an authorized draft upon his money, not upon his credit.
A bank ought to know whether it has funds to meet a
check.   It usually does know ; and to allow an agent under
such a power to over-draw, without limit, at the hazard
and risk of the principal, would greatly tend to facilitate
frauds ; would rather hold out a temptation to an agent.
An authority to an agent to sign checks is best interpreted
by confining its use to the legitimate purpose (as between
the bank and the principal) for which the law presumes
checks to be drawn, viz : to draw out the money of the prin-
cipal.   This doctrine, of course, has no application if the
money so drawn was paid to the principal ; or if the act
were in any manner ratified by him.   The case at bar does
not, perhaps, necessarily involve the question whether the
power authorized the agent to overdraw.   In fact, the plain-
tiff never intended to allow an over-draft.   The bank
never, in fact, trusted the defendant, never assumed to ad-
vance money on these checks beyond the amount standing
to the defendant's credit.   It assumed to pay them from the
funds of the defendant.   It was misled and deceived by the
fraudulent and false entries of its own book-keeper.   This
book-keeper was, as to the entries in the books, the agent of
the bank—its clerk and servant.   If these fraudulent en-
tries had not been made, the checks would not have been
paid.   The loss then is occasioned by the fraud of an agent,
clerk and servant of the bank ; by the fraud of a clerk in
regard to his legitimate business, in his appropriate depart-
ment in the bank, and therefore obligatory on the bank, so
far as respects innocent third persons.   In judgment of law,
therefore, the act of the clerk in this respect was the act of

the bank. (*See Washington Bank* v. *Lewis,* 22 *Pick.* 24 ; *Foster* v. *Essex Bank,* 17 *Mass. R.* 479.)

If the defendant never had any knowledge of these frauds—never partook of their proceeds or profits—it would be unjust to charge him with this loss of the bank, when it was caused by the bank's own wrong. The agent of the defendant to draw checks was not his agent to commit or participate in these frauds. The bank must look for redress to its book-keeper and his sureties, if he gave any, and to those who participated in the frauds.

The plaintiff sought to show that the defendant had received the proceeds, or a part of the proceeds, of these overdrafts—sought to show that he was a member of the firm of Mott Brother, or Mott Brothers, where a large portion of the proceeds seems to have gone when they were received from the bank, but the referee found against him on both points, and there is a good deal of evidence to sustain that finding; too much to warrant this court, on appeal, to reverse the judgment on that ground—though it cannot be denied that the fact of copartnership is not free from doubt, on the evidence.

The referee did not find in terms that the plaintiff paid the several notes and checks mentioned in its first and second requests to the referee to find; nor, if paid, whether there were any funds in the hands of the defendant when they or any of them were paid. The evidence, I think, clearly shows they were paid. I assume that they were paid by the bank. Then the case shows that the defendant had funds to meet them at the bank. I have not gone over the figures in the case as to each item, but the defendant's counsel in his brief on this point has done so, and shows that result, and the plaintiff's counsel in reply thereto has failed to detect or exhibit any error therein. It was quite proper and pertinent that the referee should have found the facts as to those requests. They should have been substantially found, and had the plaintiffs' counsel insisted upon it, I think the court would

have required a more particular finding.    But if on a review in this court the evidence sustains the general finding of the referee, I do not think the court is required by any principle or sound rule of practice to reverse the judgment for such cause, though it perhaps may do so, or what is more appropriate, suspend the cause until the referee finds and reports the fact.    This course was not unfrequently adopted in the old supreme court, and has been occasionally adopted in this court, and is in my judgment more appropriate and far less expensive to the parties.    I see no objection to this practice under the code.    Though the case now comes here on appeal in form from a judgment, yet it is all in the same court, and the motion is now made after instead of before judgment, as formerly.    Besides, neither party gains any thing by reversing a judgment on such a ground, except the trouble and expense of trying it again.    The referee in this case has found as a fact, the general result that the defendant did not overdraw his account and is not indebted to the plaintiff.    I think it quite clear that the referee was right in not requiring an answer from the witness Glassey to the question " by whose instructions the answer of M. H. Mott was prepared." If it had any pertinency it called directly for the disclosure of matters communicated to him professionally ; also in rejecting the record in a suit between other parties ; also in excluding business directories of the city as evidence of a partnership of the defendant with Mott Brothers.    The evidence for such a purpose is not much above mere rumor. The decision of the referee in refusing to strike out the evidence of M. H. Mott as to the sale from the defendant to himself of the interest in the firm of Mott Brothers is very questionable, and I think erroneous.    The sale, he said, was in writing ; and then, on further cross-examination, that it consisted simply of an account of stock taken, " and a receipt for what they paid for the stock."    It has been held, I think on doubtful grounds, that you may give oral evidence of the contents of a mere receipt, without producing it.    But taking

The Union Bank *v.* Mott.

all the evidence of this witness together, it is quite clear that this paper was a bill of sale, as well as a receipt. To speak most favorably for the defendant, on the testimony of this witness, the real contents of that paper were left in just that doubtful condition that required its production to present the clear truth; a proper illustration too of the force and propriety of the rule that requires the production of the best evidence. The decision cannot be sustained upon the ground assumed here by the defendant's counsel, that it was a cross-examination as to a matter introduced by the opposite party. The plaintiff had proved by Metcalf the existence of a written dissolution of the firm of Mott Brothers, somewhere in 1854, (signed by the defendant and others,) which at that time, as he said, consisted of the defendant, with others; but he had not possession of that paper. The witness Mott was called to produce that paper. He denied having it, and denied its existence, and then on cross-examination swore that the firm was dissolved in 1844 or 1845. This was an affirmative and independent fact, and cannot be upheld as a cross-examination. There was nothing to cross-examine about. The witness had expressly denied having the paper he was called upon to produce, and positively denied that such a paper ever existed. There was no pretense for a cross-examination in such a case.

A decision upon this point the other way would not probably have affected the result of the trial.; still the question touched the part of the case chiefly litigated before the referee, and as to which there was a good deal of evidence on both sides, and it was finally left not free from doubt. In such a case I do not think the court can properly say that this evidence was harmless. The judgment should be reversed and a new trial ordered.

[NEW YORK GENERAL TERM, February 2, 1863. *Ingraham, Leonard* and *Peckham,* Justices.]