## UNION GOLD MINING COMPANY v. ROCKY MOUNTAIN NATIONAL BANK.

BANKS — *An overdraft by* an agent, of his principal's account, with the knowledge of the cashier of the bank, the credit being extended to the principal, amounts to a simple loan of money, and does not involve moral turpitude, whether the cashier had authority to extend such accommodation or not.

The authority of the cashier cannot be questioned in an action by the bank to recover the money.

The case of *Union Bank* v. *Mott*, 39 Barb. 180, distinguished.

NATIONAL BANKS — *security for loans.*  The omission of the officer of a national bank to exact security for moneys lent, cannot be made a ground of defense to an action brought by the bank to recover such loan.

CORPORATIONS — *power to borrow money.*  A corporation, unless prohibited, has authority to borrow money to accomplish the purpose for which it was organized.

*Estoppel.*  A corporation which has, through its agents, borrowed money and applies it to its own purposes, is estopped to deny its own power in the premises.

CONTRACTS — *illegal.*  The omission of a national bank to take security for a loan of money is not available as a defense to an action to recover the money.

ESTOPPEL — *authority of agent.*  One who borrows money from another, assuming to act as the agent of a third person, is estopped to deny the authority of the agent to lend, in an action by the principal to recover the loan.

A corporation whose agent has obtained money by overdraft, at a bank, and applied it to the purposes of the company, is estopped to deny its power to borrow money, in an action by the bank to recover the loan.

ERROR — *what may be assigned.*  Matters not objected to in the court below cannot be assigned for error.

PRINCIPAL AND AGENT — *authority of agent.*  One who obtains the money of another by way of loan from a third person, assuming to act as the agent of him to whom the money belongs, is estopped to question the authority of the agent to lend, in an action by the principal to recover the loan.

*Agency implied from conduct.*  If an officer of a corporation is suffered to exercise general authority, in respect to the corporate business, or in respect to a particular branch of it, for a considerable time, the corporation is bound by his acts, within the scope of the powers so assumed, in the same manner as if authority had been expressly granted.

*Same.*  To establish that S. was the agent of the corporation defendant, the plaintiff offered letters written by the president of the corporation to S., in which he was addressed as superintendent of the company, and the affairs and prospects of the company were discussed.  It was shown that the president, for a considerable time before this and afterward, had assumed general authority in the affairs of the corporation, the control of its prop-

erty, payment of its debts, and the management of its lawsuits. *Held*, that the letters were admissible without direct evidence of authority to write them, the presumption being indulged that the president was acting the part of a faithful executive, and with the knowledge and assent of the corporation.

*Ratification — evidence.* S., assuming to be the mining superintendent of defendant, obtained money in its name. In an action to recover the loan, the plaintiff relied upon an alleged ratification of 'the acts of S. *Held*, that upon the question of ratification the fact that S. was the agent of the company for some purpose, and the nature and extent of his agency (even though not extending to the act in question), was material and competent.

So of letters addressed by the president of the corporation to S., recognizing him as the superintendent of the company, though such letters were not expressly shown to have been expressly authorized.

So of the fact that the corporation had discharged other debts contracted about the same time by S. in its name.

So that the money was appropriated by S. to the uses of the defendant, and that the result was beneficial. The resolution upon this point in the same case, 1 Col. Rep. 531, reconsidered.

S., assuming to be superintendent of a foreign corporation, organized for the purpose of working gold mines in this territory, the functions of which office did not extend to borrowing money, obtained money upon the credit of the company ; the lender suing the corporation relied upon the silence of the company after notice, as a ratification of the loan. It appeared in evidence, that during his operation S. had arranged with B., the president of the company, to use a mill, which was the individual property of B., and to develop a mining claim, also the individual property of B., in compensation for the use of the mill, and a considerable part of the moneys sued for were expended in this work; no officer or member of the company except B. was informed of this until after action brought.

Some part of the money was also used in mining upon a claim belonging to S. himself ; B. was informed of this after the expenditure of the money, but so far as appeared did not communicate his knowledge to the corporation.

*Held*, that these facts did not affect the question of ratification.

Where the unauthorized transaction is complete before knowledge thereof comes to the alleged principal, and no change in the position of the parties can occur from his delay to approve or disapprove it, mere silence on his part affords an inference of ratification, and is evidence for the jury, but no estoppel is created thereby.

When the transaction is still in progress, or the person dealing with the alleged agent has opportunity to regain what he has parted with, or otherwise improve his position, the alleged principal is bound to approve or disapprove within a reasonable time after notice, and in such case, silence is conclusive evidence of assent.

*Notice to officer of corporation.* Notice to the president of a mining corporation of the acts of one who, without authority, has assumed to act for it is

notice to the corporation itself, and when sought to be made liable through a ratification by silence, it will not be heard to say that the president in receiving the notice was acting in his individual capacity, and not officially.

### Appeal from District Court, Jefferson County.

THIS cause was determined in this court at the term of 1872, upon appeal from a former judgment of the district court, and is reported in 1 Col. 533, where the pleadings are set forth. The judgment being there reversed, the cause was remanded and tried again at the November term, 1872, of the district court; judgment being given for the plaintiff, the defendant prosecuted this appeal.

Evidence was given tending to show that the defendant was incorporated under the law of the State of New York ; its principal office and place of meeting was in the city of New York ; all its officers and members except the president, one Becker, resided there during the accruing of plaintiff's demand ; the mines were located in Gilpin county. The defendant commenced mining in 1864, and continued until the fall of 1865, when its operations were suspended and the mine closed. One Sabin was the superintendent of the mine from the spring of 1865 until the close of operations in the fall of that year; after that he remained in charge of the company's property until the spring of 1866.

In March, 1866, Sabin went east, and at his suggestion, another person was appointed as keeper of the property, and was paid by the company until November, 1866, when Sabin returned and resumed mining operations. There was testimony tending to show that, in the spring of 1866, Sabin resigned his position as superintendent, and that, in resuming work, he was acting under an agreement with the defendant to work the mine upon his own account, and with his own means, retaining the ores of lower grade to his own use, and rendering the first-class ore to the company as rent or compensation for the use of the mine. There was, also, testimony tending to show that at the time of re-opening the mine in the fall of 1866, he professed to be operating upon his own account ; that he borrowed money and

employed men upon his individual credit for this purpose, and none of the officers of the company, save the president, Mr. Becker, were informed, until December, 1868, that Sabin was assuming to act for the corporation.

During all the time, however, Sabin occupied the office which had been previously occupied by the corporation; the sign of the company was upon the building, and Sabin always represented to the plaintiff, that he was the superintendent of the defendant. In 1867 he opened an account in the name of the defendant at the plaintiff's bank, and from that time until the fall of 1868, was accustomed to sell at the bank the gold, which was the product of his mining, placing the proceeds to the credit of defendant, and from time to time drew checks against it. The labor of the men at the mine, and other liabilities incurred in his operations, were discharged by these checks. Previous to April, 1868, there was sometimes money to the credit of this account; after that, the account was always overdrawn until the fall of 1868, when his operations were suspended, and the company resumed possession of the mine. The money obtained by this overdraft was used in operating and improving the mine and in milling the ore.

Plaintiff was permitted to show, against defendant's objection, that Sabin had accumulated, and had on hand about 400 tons of the selected ore, at the time when he ceased operations in the fall of 1868. During the time of his operations, subsequent to 1866, Sabin corresponded solely with Mr. Becker. The latter visited Gilpin county in the spring or summer of 1867, and remained at and in vicinity of the mine for several weeks; he returned again in January and again in October of the same year. Whether Mr. Becker was informed, prior to December, 1868, that Sabin had assumed to contract an indebtedness at the bank in the name of the company, was in dispute; but during 1867 and 1868, Mr. Becker had repeatedly addressed letters to him as superintendent of the company, giving directions for the defense of an action brought against the company, and advising as to the manner of conducting the

mine. After the operations ceased he paid other debts contracted by Sabin for the mine, and in the spring of 1869 he made a settlement with Sabin, and paid him for his services, computing his salary at the same rate as during 1865, 1866.

In the fall of 1868 Sabin became the owner of mining premises adjoining these of the defendant, on the west, and there was evidence tending to show that some part of the money obtained from the plaintiff was expended in mining upon this claim. Mr. Becker swore that he was first informed of this in December, 1868.

There was also evidence that in 1867 Sabin had obtained from Becker permission to use a mill which was the individual property of Becker, agreeing to develop a claim of Becker's adjoining the premises of the company, in compensation therefor, and that a considerable part of the moneys were expended in this work.

There was also evidence tending to show that in October, 1868, Sabin had executed two promissory notes, in the name of the company, for the amount of the overdraft at that time, $10,000, and that this was without the knowledge of any officer of the company, until, during the trial, these notes were produced and canceled in open court.

There was evidence tending to show that in November and December, 1868, Mr. Becker was repeatedly informed by the officers of the bank of the fact of the overdraft and its amount, and promised to pay it.

In January, 1869, he addressed to the president of the bank a letter, in which he spoke of "the overdraft of our company," protested that he had no knowledge of it until about the middle of December previous; stated that it was the only indebtedness of the company of which he had any knowledge, and that if not paid off from the mine, he proposed to call a meeting of the directors, and make an assessment at the February meeting, to pay off this and any other claim that the company might owe. The full text of this letter may be found in 1 Colorado, 535.

Mr. Becker, however, testified that this letter was written at the urgent solicitation of Kountze, one of the officers of

the bank ; that he refused to sign it in his official capacity, or to speak for the corporation, and that he, at the time, expressly disclaimed all authority for the company in the premises.

There was also evidence, tending to show that, immediately upon being informed of the overdraft, Becker had addressed the vice-president of the company in New York, stating the facts, and inquiring whether any new arrangement had been made with Sabin, authorizing such an assumption of authority ; that the vice-president had replied in the negative ; that this was transmitted to Becker, who communicated it to the officers of the bank — upon the point of such communication the evidence was conflicting ; that in April, 1869, the stockholders met and repudiated the claim of the bank, and that this action was communicated to the officers of the bank, at some time afterward. The officers of the bank denied that such communication was made until shortly prior to the former trial.

The statute of the State of New York, under which defendant was organized by certificate of association, was put in evidence, and contained no authority to the corporations formed thereunder to borrow money ; nor was there any express prohibition upon the exercise of such a power. The act, however, contained a provision for the increase of the capital stock of the corporation, by consent of those holding two-thirds of the shares, upon notice. The by laws of the company were also given in evidence, and the letter of instructions and authority under which Sabin was originally appointed superintendent, in which there was no express authority to borrow money on the credit of the company.

The court instructed the jury that if Sabin was the agent of the defendant, and while so acting, borrowed the money sued for in the name of the defendant and Sabin's dealings with the bank were fully explained to Becker, and Becker informed the company thereof, these circumstances called

for an answer from the company, and if through its board of directors it failed to disavow the acts of Sabin within a reasonable time, they should find for the plaintiff.

Mr. Hugh Butler and Mr. G. B. Reed, for the appellant.

Mr. W. R. Gorsline, Mr. H. M. Teller and Mr. Jno. Q Charles, for the appellee.

Hallett, C. J.    This cause was before this court at the last term, and several questions, now again presented, were then considered and definitely determined, so far as this court may do so.    Of this number is the sufficiency of appellant's pleas, by which the competency of appellee to maintain an action for a sum exceeding ten per cent of its capital, was denied, and that question is not now open to examination in this court.    The legality of appellee's demand is now however further challenged, upon the additional ground that an overdraft upon a bank, of which the account in suit is an example, is fraudulent *per se* and cannot be made the basis of an action of assumpsit.    For this we are cited to the case of an agent, who, by collusion with the book-keeper of a bank, obtained money in the name of his principal, for which it was said the latter was not liable for several reasons ; although the agent had authority to draw upon the funds of his principal in the bank, his authority did not extend beyond that point to enable him to borrow money ; credit was not given to the principal, the bank being misled by fraudulent entries of its own book-keeper.    *Union Bank* v. *Mott*, 39 Barb. 180.    That this has no application to a case in which a depositor is allowed to overdraw his account, either by the express permission or inadvertence of the officers of the bank, is apparent at a glance, and the court say, in their opinion, that the doctrine cannot be applied to a case where money, drawn by an agent, is received by the principal, or the act of the agent is ratified by him.    If it be true that one who, without notice, draws upon a bank in which he has no funds, commits a fraud

upon the payee of the check, and upon the bank, it will hardly be claimed that the latter is without remedy against him for the money paid.   Although, in such case, the bank may have a remedy against the officer who pays the check, for the perversion of its funds, it may, nevertheless, ratify the proceedings and treat the money paid as a loan.   *U. S. Bank* v. *Macalister*, 9 Penn. St. 478.   But, if this were not true, the case of an agreement between the parties, by which the depositor is allowed to overdraw his account, does not involve turpitude on the part of any one.   The transaction is then a loan simply, which is not obnoxious to any law. Morse on Banks, 318.   A national bank is, by the act of its incorporation, required to take security for its loans, but this does not relate to the form of the loan or the evidence by which it is manifested.   Security may be taken for a loan to which the parties have orally assented and which has been made by payment of an overdraft as well as any other.   If such security is omitted, that circumstance is not available to the borrower, who can never be heard to say, that he obtained the money upon terms more favorable to himself than the law would sanction.   In this instance the money was obtained from the cashier, who appears to have had charge of the business of the bank, and it was charged to appellant upon the books of appellee.   If this is not sufficient to show the authority of the cashier to make the loan, I doubt whether appellant can rely upon the want of authority in him ; for appellant is to be charged, if at all, upon the hypothesis, that the act of Sabin in borrowing the money was its own, and one who has obtained money from an agent who assumed to act for his principal cannot question the power of the agent.   By the act of borrowing, the borrower concedes the authority of the agent to lend, or if this be incorrect, it is not material that the money has passed through unauthorized hands.   Shall A, who has obtained money from B, allege in his defense, that C, who gave it to him, was without authority from B, in that behalf? As the money came from the bank, and the negotiation was conducted in its name, it appears to me that the authority

of the cashier is not to be drawn in question in this suit, and aside from the matter of Sabin's authority to bind appellant, the case is one of money obtained by overdraft in pursuance of the arrangement of the parties. Whether the cashier is liable to appellee for the amount is a question which does not arise in this suit, nor is it connected with the question of appellant's liability, which alone we are now considering.

Upon the latter question, the objection that the indebtedness was created by overdrafts is regarded as untenable. It is urged, for the first time in this court, that appellant is incapable of borrowing money, there being no provision, in the act under which it was organized, which confers authority to that end. Although it was at one time thought that express authority was necessary to enable a corporation to borrow money, the weight of authority is now opposed to that view. If not forbidden to do so, a corporation may borrow money as a means of carrying out the purposes for which it was created. *Mills* v. *Gleason*, 11 Wis. 470; Angell & Ames on Corp., § 257.

In this instance, the money was expended in the mine, and it would seem that the company ought to be bound for its payment in the same manner as for debts contracted in the prosecution of its enterprises. In addition to this, it has been said, that as to a contract executed and fully enjoyed, a corporation is estopped to deny its capacity. *Bradley* v. *Ballard*, 55 Ill. 413; *Underwood* v. *The Newport Lyceum*, 5 B. Monr. 129. The reasons upon which this rule is founded apply with great force to a contract for borrowed money, whatever may be said of them when applied to other contracts.

But it was not shown that the company was prohibited from borrowing, and as it might have incurred debts in carrying on its mining business, so it could borrow money for the same purpose. At the trial and before any evidence was produced, two promissory notes, executed by Sabin in the name of appellant, were brought into court, and at the request of appellee, they were canceled by the court.

It does not appear that any objection to this proceeding was made by appellant, and, therefore, it is in no position to question its regularity here. Upon the trial below, as upon the former trial, it was made a question whether Sabin was an agent of appellant at the time of the transaction with the bank.

This question, comprehending also the nature and extent of the agency, was important for the purpose of ascertaining whether those transactions were within the powers conferred upon Sabin; and, if it should be found that Sabin had no authority to contract indebtedness, it was also material to the question of the ratification of his acts by appellant.

To establish an agency in the absence of better evidence, it is the common practice to resort to facts, which tend to show recognition by the principal of the alleged agent's authority. Of this nature are communications between the principal and agent, in which the authority of the latter is expressly or impliedly admitted, of which the letters from the president of appellant to Sabin afford an example. Nor, under the circumstances of this case, is it essential that these letters should be supported by evidence of express authority from the company, to its president, to write them. Of all the officers of the company, the president alone visited the territory and assumed personal control of its property ; he paid the company's debts ; gave directions respecting its lawsuits, and conducted its correspondence, in all of which we must presume that he was discharging the duties of a faithful executive, with the knowledge and approval of his company. If an officer of a corporation is allowed to exercise general authority in respect to the business of the corporation, or a particular branch of it for a considerable time ; in other words, if he is held out to the world as having authority in the premises, the corporation is bound by his acts in the same manner as if the authority were expressly granted. *Commercial Mutual Marine Insurance Co.* v. *Union Mutual Insurance Co.*, 19 How. 322; *Peyton* v. *The Governor of St. Thomas Hospital*, 3 C. & P. 363 ; *Chi-*

cago, *Burlington & Quincy R. R. Co.* v. *Coleman*, 18 Ill.
298; *Daugherty* v. *Hunter*, 54 Penn. St. 382; *Alleghany
City* v. *McClurkin*, 14 id. 81; *St. Louis, Alton & Chicago
R. R. Co.* v. *Dalby*, 19 Ill. 375; *Ardesco Oil Co.* v. *Gilson*,
63 Penn. St. 150.

The case presented is that of a foreign corporation owning
property in this territory and its president, who has at all
times largely managed its business in communication by
mail with a person in possession of its property and alleged
to be its agent. In such case, to require proof that the
draft of every letter had been submitted to the board of
directors and approved by them, or that the president was
appointed to conduct the correspondence, would be unrea-
sonable as well as unjust to those who have dealings with
the corporation. These remarks apply with equal force to
the negotiations between the officer of the bank and the
president of the company in respect to the demand in suit.
The company could not be approached except through its
officers, and of these the president alone was in the territory;
and he, in virtue of his position as the chief officer of the
company, his familiarity with its affairs and the control of
its business that he enjoyed, was the fittest person to represent
its interests. If, under such circumstances, the bank could
not present its demand to the company through the presi-
dent of the latter, it would be impossible to obtain a hearing
at all.

Hence, at the last term, we affirmed the right of the bank
to present their demand to the president of the company,
and the power and duty of the president to bring the mat-
ter to the attention of the latter. In this we did not assert
that the president had power to pledge the company to the
payment of any debt, but merely that he must hold open
the door of approach to creditors and give audience to all
demands. And we also declared that the company could
not avoid responsibility in this respect by claiming that he
acted for himself solely, and not as president of the com-
pany, and thus divest his acts of all legal significance. This
proposition is quite as applicable to the testimony before

us, as to that adduced upon the former trial, and therefore it is here again repeated.   The payment of debts contracted by Sabin in the name of the company affords some evidence that they were regularly incurred, and therefore it had a tendency to establish the fact of the agency.   I do not see that it was otherwise pertinent to the issue, for certainly the payment of one debt is no evidence that the company was liable for another.   *Forsyth* v. *Day*, 41 Me. 382.   But the agency of Sabin was in issue, and, upon this point, I think that the evidence had a bearing sufficiently direct to entitle it to admission.   At the last term it was said that Sabin's authority as superintendent of appellant's mine did not enable him to borrow money in the name of his principal, and that the liability of appellant for money obtained in its name, must be determined upon evidence showing its acquiescence in, and approval of, the transaction with the bank.   Upon the evidence then presented, it appeared that the president of the company was informed of the loan about the middle of December, and that he then communicated the fact to his company; following this, on the 1st of January, he entered into an agreement with the president of the bank, by which, if the claim should not be paid at an earlier date, it was to be submitted to the board of directors of the company in New York city, at a meeting to be held in February, in order that they might provide for its payment.   It did not appear that the company, at any time before the commencement of the suit, replied to the demand of the bank or disapproved of Sabin's act in borrowing the money, and this was regarded as evidence of satisfaction sufficient to warrant the finding of the fact.   The general propositions here stated have been vigorously assailed, but not at all shaken.   It is certainly true, that ratification of the acts of an agent, done in excess of his authority, may be manifested by the silence of the principal.   *Law* v. *Cross*, 1 Black, 533.   And the rule is applicable to corporations as well as to natural persons.   *Hoyt* v. *Thompson's Ex'rs*, 19 N. Y. 218; *T. W. & W. R. R. Co.* v. *Prince*, 50 Ill. 27.   A distinction has been made between the acts of an agent who

has gone beyond his authority, and those of a mere stranger intermeddling in affairs with which he is in no way concerned.    In the case of a stranger, it has been said that the act will not be binding upon the principal unless expressly ratified by him.    *Ward* v. *Williams*, 26 Ill. 451.    But the better opinion appears to be, that in this, as in the case where an agency exists, the approval of the principal may be inferred from his silence and acquiescence when informed of what has been done in his name.    *Philadelphia, Wilmington & Baltimore R. R. Co.* v. *Cowell*, 28 Penn. St. 329 ; *Ladd* v. *Heilderbrant*, 27 Wis. 135.    But all agree that the relations of the parties are of great consequence in determining the question of ratification, the presumption arising from acquiescence being very much stronger where the agency exists than in the case of a mere stranger.    Story on Agency, § 256.    Hence the agency of Sabin is an important question in this cause, although the dealings with the bank were not within the powers conferred upon him.    So, also, it seems that the appropriations of the money, and the fact that the use of it was advantageous to the party to be charged, are circumstances of some weight respecting the question of ratification.    *Harris* v. *School District*, 28 N. H. 58 ; *Wilson* v. *School District*, 32 id. 118 ; *Philadelphia, Wilmington & Baltimore R. R. Co.* v. *Cowell*, 28 Penn. St. 329.    It is fair to presume that a party will more readily repay money which has come to his use, although without his knowledge, than he would if it had been wholly appropriated by the person assuming to act in his behalf.    And where the money has been of advantage to the party to be charged, his willingness to repay it may depend largely upon that circumstance.    It is true that no legal obligation arises out of these circumstances, for no one can make himself th creditor of another by doing an act beneficial to him, without his consent.    But much less evidence of the assent of the principal to the act of the agent may be required in a case where the money has come to his use, and has been expended in a manner advantageous to him, than would otherwise be necessary.    Referring only to the consideration

that use of the money gave rise to no legal obligation to
repay it, and to the instructions to the jury then before the
court, in our former opinion, we were led into the broad
declaration that the use of money was not material to the
question of ratification.   The statement then made must be
modified or revoked to give place to the true principle here
announced.   It is urged that appellant was not informed at
or before the time of the alleged ratification that Sabin had
extended his mining operations into the property of the
president of the company and into his own property, all of
which adjoined that of the company.   It seems, however,
that the president of the company was fully informed of the
extent to which such mining was carried, and indeed upon
his own claim it was done by his express permission.   As
the president was directing the operations at the mine, I
do not see that there was any very wide departure from
duty in following his directions.   But if this were not so,
the failure of the president to communicate the facts to his
company cannot affect the rights of appellee; and again,
the business of appellant was that of mining ore for the
purpose of obtaining gold therefrom, and all the ore taken
out by Sabin was crushed by him or left in the possession
of the president of the company.   If the company obtained
the ore or the proceeds thereof, there would appear to be no
one who could complain of the taking except the parties
who were deprived of it.   Whether the agent has a remedy
for a trespass committed by himself, or the president of the
company may have redress for an entry made under his
direction, we are not now required to consider or determine.
Under the circumstances disclosed by the evidence, it is
obvious that the mining done upon the property of the presi-
dent and agent of the company was quite as much the act
of the company as that which was done upon its property,
and the circumstance that a portion of the money obtained
from the bank was there expended, does not affect the ques-
tion of ratification.   Further comment upon the testimony
is believed to be unnecessary, and we pass to the instruc-

tions to the jury, which will be considered with reference to one question only.

Numerous cases are found in the books which illustrate the distinction between the cases in which the principal must repudiate the acts of his agent who has overstepped his authority, within a reasonable time after notice thereof, and those in which his failure to do so will be regarded as evidence of acquiescence, for the consideration of the jury. Of the first class, the case of *Law* v. *Cross*, 1 Black, 533, is an example. Under instructions to purchase coal at Valparaiso, an agent made the purchase at Coquimbo, a day's sail from the former place, and the coal was subsequently shipped to San Francisco. The principal being informed of this transaction, failed to notify the agent of his disapproval. The court say : "As the coal was purchased for the principal, it belonged to him if he chose to accept it. If the price had risen and Cross had sold it, Law might justly have claimed the profits ; and when informed by his agent of what he had done, if the principal did not choose to affirm the act, it was his duty to give immediate information of his repudiation. He cannot, by holding his peace and apparent acquiescence, have the benefit of the contract if it should afterward turn out to be profitable, and retain a right to repudiate, if otherwise." It will be observed, that the reason here assigned for requiring the principal to disavow the agency promptly after notice, operates as an estoppel upon him ; that is to say, he cannot repudiate the transaction without wrong to the agent, and therefore, he shall not be permitted to repudiate it at all. The principle is believed to be applicable to all cases in which the parties acting in the belief that the agency is valid, have suffered a change of circumstances, and cannot be restored to the position in which they would have been, if the agency had been repudiated immediately upon notice of the unauthorized act. But it cannot be extended to cases in which no such change of circumstances has taken place, no injury having resulted to any one from the neglect of the principal, and where he could have gained nothing by delay. Note to *Culver* v.

*Ashley*, 1 Am. L. C. (5th ed.) 719. For example, one who had no authority whatever from the defendant, subscribed in his name to the stock of a railroad company, and immediately notified him of the fact. After some time, suit was brought by the company to recover the amount of the subscription, and the circumstances were submitted to the jury as evidence of ratification, but it was not contended that the defendant was in any manner estopped from denying the validity of the subscription. *Philadelphia, Wilmington & Baltimore R. R. Co.* v. *Cowell*, 28 Penn. St. 329. No change had taken place in the position of the parties from the date of the subscription until the suit was brought; nor was there any thing unconscionable in the defendant's refusal to pay the demand. Therefore, the case was not one in which the defendant was estopped to deny the authority of the agent; but the question was, whether by his silence when informed of what had been done in his name, he had shown a purpose to adopt the act. In this class of cases, the evidence of silence, and acquiescence on the part of the principal, is valuable only as indicating the intention of the principal with reference to the act of his agent; while in the first-mentioned cases, the facts being proved, the conclusion follows as matter of law. "In cases where the principal is estopped to deny the agency, the jury are told that if he has failed to repudiate the agency within a reasonable time after receiving notice of the unauthorized act, they should find the fact of ratification, and such was the instruction in *Law* v. *Cross*. This would not, however, be a proper instruction in a case where the silence of the principal is merely evidence of his assent, for the obvious reason that the effect of such evidence is to be determined by the jury." *Bates' Ex'rs*, v. *Best's Ex'rs*, 13 B. Monr. 215.

At the last term we ascertained that the case at bar is of the class in which the principle of estoppel cannot be applied, inasmuch as the position of the parties remains unchanged, and the failure to disavow the agency has not worked injury to the appellee or influenced its conduct, nor has appellant derived any advantage therefrom. Hence the charge that

appellant must have repudiated the debt within a reasonable time after notice thereof, was not warranted by the circumstances of the case, the failure to disavow the agency, if there was such failure, being evidence of acquiescence and assent, for the consideration of the jury, and the effect of it to be determined by them. The most important features of this case have been twice considered by this court, and so far as we are concerned, definitely determined. Numerous points urged upon our attention have not been discussed, for the reason that they are not regarded as affecting materially the rights of the parties.

The judgment of the district court is reversed, and the cause is remanded for a new trial.

WELLS, J. I agree, that for the errors in the charge of the court, the judgment of the district court must be reversed, but upon two questions which are considered in the opinion of the chief-justice, I do not assent to all that is there said.

1. I agree that the letters of the president of the corporation, Mr. Becker, to Sabin, in some of which Sabin is addressed as superintendent of the company, and in others of which he is directed touching its business, were properly received. It is fair to presume, that the president of the corporation knew who was in immediate charge of its affairs at the scene of its operations, and the fact that the president of the corporation addresses Mr. Sabin as its superintendent affords, at least, some evidence of the existence of this relation. But it is said, that if an officer of a corporation is allowed to exercise general authority for a considerable time, and so held out to the world as having authority in the premises, the corporation will be thereafter bound by his acts, in the same manner as if authority had been expressly granted. It cannot be doubted, that acquiescence by a corporation, for a considerable time, in the acts of one, who, without original authority, assumes to act for it, will, as to third persons, having knowledge of the previous assumptions of authority and the acquiescence therein, and dealing with the pretended agent on the faith thereof, create

an agency by an implication of law. In the present case, however, this is asserted of a non-resident corporation whose principal office was in a foreign state, in respect to the acts of their officer done here. So far as shown by the evidence, no officer of the corporation, except Becker, and no stockholder ever resided here or ever was here, even temporarily during the time of Becker's transactions in question, and no officer or stockholder is shown to have ever had any intimation of these transactions. How, then, can the corporation be said to have acquiesced in them, or to have held Becker out to the world as having the authority which he assumed ? I grant, that if by the exercise of such attention to its affairs as a man of ordinary prudence in the like case would have exercised, the corporation might have informed itself of Becker's doings; it is the same as if they had actual knowledge. The corporation ought not to be heard to say that it did not know that which, by the ordinary diligence which the law exacts of them, they might have known, and it may be that, as to the particular matter in question, this corporation is shown to have been derelict. The opinion of the chief-justice, however, proceeds upon the ground, that under all circumstances the long exercise of authority on behalf of a corporation raises the presumption of an original appointment which I am not prepared to admit.

2. While I doubt whether it appears by the evidence that any portion of the money for which the action is brought, was expended in the improvements made upon the property of Mr. Becker, I incline to the opinion that if such be the fact, it is *prima facie* a circumstance material to be communicated to the mining company, in order to warrant the inference of ratification.

The burden of proving such communication or the existence of attending circumstances, rendering the omission of such communication immaterial, rested upon the plaintiff, and there being no proof on either point, ratification could not be inferred from the company's silence.

The judgment must, therefore, if we concede that some

part of the money was expended as here supposed, be reversed on this ground also.

BELFORD, J., dissenting. The rule is pretty well established among respectable courts, that an appellate tribunal will never reverse itself in the same cause. The reason for the rule is that the court below is bound to respect the views of the supervisory court, and if this latter court were allowed to change its views with every trial of the cause, there could be no end to litigation. The district judge would be liable to have his action reversed simply because he obeyed a direction made by his superiors, and for whose ideas he unfortunately entertained some little respect. It is quite as important that there should be some stability attendant upon judicial decisions as it is that they should be right. A regard for this principle has induced me to enter my protest against the manner in which this case has been treated in this court. When it was brought here first, I did not participate in the discussion or decision of it, and I feel that I am in no way responsible for the principles announced in the opinion delivered by the chief-justice. When I first read it, I realized that it was in some respects ill-digested, and in others manifestly wrong. It was evidently calculated to mislead the district judge and the counsel engaged in the trial of the cause, and that such was its result will be made apparent before I conclude. On the first trial evidence was admitted to show that the money borrowed by Sabin was used by him in working and developing the mining property of the defendant, and that the profits arising from the extraction of the ore and the working of the mine went to the defendant. The court instructed the jury that they should consider these facts in determining the liability of the defendant. The learned chief-justice in his first opinion treated the admission of this evidence and the instruction of the court with manifest disfavor, for he says: "The circumstance that the company retained the ore taken from the mine is not material to the question of ratification." In other words, he announced the startling

proposition that the jury was not at liberty to consider any advantage the principal might derive from the acts of his agent.   An agent might borrow money from a bank or individual, expend it in working the property of his principal, and the principal might become enriched by the expenditure thus made, and when called upon to pay the money through whose use he derived his profits, it is error to instruct the jury that in determining the question of ratification they are at liberty to take note of these circumstances.   A more careful review of the authorities led the judge below to disregard the opinion pronounced by this court, and to admit the evidence a second time, and the learned chief-justice in the present opinion states: "So also it seems that the appropriation of the money, and the fact that the use of it was advantageous to the party, to be charged, are circumstances of some weight respecting the question of ratification.   *Harris* v. *School District,* 28 N. H. 58; *Wilson* v. *School District,* 32 id. 118." To which authorities might be added *Cowell* v. *R. R. Co.,* 28 Penn. St. 329; *Alleghany City* v. *McClarbin,* 14 id. 81; *Bank* v. *Comb,* 7 Barr. 543.   The reversal of the judgment at this time is based upon alleged error in the instructions, and I desire to set them out so that they be compared not only with principles announced in the first opinion, but also with the language of the court. The instructions are as follows: "If you find from the evidence that Becker was president of the Union Gold Mining Company on the 16th day of December, 1868, and that he had full knowledge of this indebtedness to the bank at that time, and that he agreed to lay the claim of the bank before the board of directors at the February meeting of the board, then the court instructs you that, although you may find from the evidence that Becker had no authority to pledge the company to the payment of the debt, still he, as president, had authority to convene the board of directors to consider the claim at that time, and to take some action in reference thereto, and if you find from the evidence that the board of directors failed or refused to consider said claim,

or failed to disavow or repudiate the debt within a reasonable time thereafter, and to notify the officers of the bank of such disavowal, then you will be warranted in finding that the company ratified Sabin's dealings with the bank, for when an agency exists, and the agent exceeds his authority, the silence of the principal, when he has full information on which he can and ought to act, gives rise to the presumption of an intentional ratification of the unauthorized act. In determining whether the company ratified the act of Sabin, you will consider the negotiations with Becker, the notice to the company of the indebtedness, the agreement to lay the claim before the February meeting of the board of directors, and the conduct of the company in reference thereto. If, at any time, the company assented to the acts of its agent, it is as much bound by those acts as it would have been if the agent had been clothed with authority to perform them. When the relation of principal and agent does, in fact, exist, although in the particular transaction the agent has exceeded his authority, an intention to ratify will always be presumed from the silence of the principal who has received a letter informing him what has been done on his account." From the foregoing instructions, it will be observed that, in the opinion of the judge who tried the case, it was incumbent on the defendant to take some action in reference to the claim of the bank, and if at the February meeting of the board of directors it failed to take such action and disavow the conduct of its agent in borrowing this money, then the jury would be warranted in finding that the agent's acts had been ratified. In giving these instructions the judge was fully warranted by the language and spirit of the opinion pronounced by this court when the cause was first here. Upon page 547, 1 Col. Rep., the chief-justice says: "The matter of Sabin's dealings with the bank appears to have been fully explained to Becker, and by his statement the company was equally well informed. *The circumstances called for an answer from the company.* Money had been obtained by its agent, and upon its credit, and the bank

was demanding payment. The president of the company acknowledged the justice of the demand, and if the company had any objection to it, it was reasonable to believe that such objections would be made known." Again, he says, page 546: "Upon this rule it appears to me that Becker's undertaking to bring the claim of the bank before the board of directors of his company at the *February meeting bound the company to consider the claim at that time.* The undertaking was an exercise of the executive function, and we are at liberty to presume that it was performed. Upon the evidence, it seems that notice of the indebtedness was given to the company December 16, 1868. Fifteen days later Becker undertook to present the claim to the board of directors at the February meeting in New York. If the matter was acted on by the company, it does not appear that any notice of the result was given to the bank. Upon these facts, the jury would have been waranted in finding that the company had ratified Sabin's dealings with the bank, *for, when an agency exists, and the agent exceeds his authority, the silence of the principal may give rise* to a presumption of an intentional ratification of the *unauthorized act.*"

Again, he says: "If, however, Becker had no authority to pledge the company to the payment of any indebtedness, he certainly had authority to convene the board of directors, and lay before them the claim of the bank, and this he agreed to do. In the usual course of business, the corporation is addressed through its president; and it is an important duty of the executive officer to bring to the knowledge of the board of directors any matter affecting the interest of the corporation." Again, he says: "The question is as to the intention of the company respecting Sabin's dealings with the bank, to be determined upon evidence of its conduct, and the declarations of its authorized agents, within the scope of their authority. If at any time the company assented to the acts of its agent, it is as much bound by these acts as it would have been if the agent had been clothed with authority to perform them. The negotiations

with Becker, the notice to the company of the indebtedness, the agreement to consider the matter at the February meeting of the board of directors, and the delay of the company to disavow Sabin's acts, are facts to be considered by the jury, whose province it is to determine the question of ratification." Is it not clear from the above, that this court held that the action of Sabin with the bank, "called for an answer from the company?" Is it not equally clear "that Becker's undertaking to bring the claim of the bank before the board of directors of his company at the February meeting, bound the company to consider the claim at that time?" Is it not clear, also, that with the knowledge of the indebtedness, and the failure to take action on the same by the company at the February meeting, "the jury would have been warranted in finding that the company had ratified Sabin's dealings with the bank, for when an agency exists, and the agent exceeds his authority, the silence of the principal may give rise to a presumption of an intentional ratification of the unauthorized act." How can it be said that the conduct of Sabin called for an answer from the company, if no legal obligation existed on the part of the company to make any. How can it be said that the failure to consider the claim at the February meeting, and take some action in reference thereto, would have warranted the jury in finding a ratification, if it be true as is said now, that the company was not required to take any action at all. To any fair mind, the conclusion must be irresistible, that the instructions given, and on account of which this cause is now reversed, embrace not only the principles announced by this court, but embody its very language.

The case of *Horton* v. *Townes* is quoted with approval and put forth as an authority entitled to great consideration in connection with this case. The facts of the two cases have nothing in common ; they are as widely apart as the poles. In *Horton* v. *Townes*, the agent had authority to negotiate and discount notes at a specified bank, not to exceed in amount the sum of $3,000. The principal, however, was to derive no benefit from this transaction.

The advantages were to inure to the agent. It further appears that the agent, standing in need of provisions for himself and family, bought groceries to the amount of $500, and executed to the vendor a note in the name of his principal. Suit was afterward brought against the principal, and it was sought to charge him on the ground that, after the note was executed, he had full information of the act of his agent and maintained silence in reference thereto. The court held, and very properly too, that the plaintiff could not recover. TUCKER, J., says: "The transaction was one from which the defendants could derive no profits." Why repudiate a transaction with which one has no possible connection. If Sabin had used the money he borrowed of the bank, in buying provisions for his family, the two cases would be alike. But this he did not do. The money was used in an enterprise in which he was legitimately engaged. It went to the benefit of the principal; the ore extracted by the use of it went into the hands of the corporation for which he was working. When the facts change, the rule changes with them. There is another phase of this case which is proper at this time to consider. Already, there have been two trials of this cause. Some points have been definitely settled by this court. Some questions have been twice solved by the jury. Two juries have found that Sabin was agent and not lessee. Shall the verdict be set aside wholly or in part? Shall the cause be sent back and the plaintiff be compelled to fight this old battle of agency over again, or shall the next trial be confined to the simple point in which this court has found error? Upon general principles, the plaintiff in this case has as clear a right to the verdict upon the questions that were rightly tried as the defendant has to a new trial of the questions that were wrongly tried. And when the defendant asks the court to deprive the plaintiff of the ground fairly and legally won, and to put the plaintiff to another expensive, laborious and vexatious campaign to recover the same ground a second time, it is for the defendant to show how such an extraordinary, unjust and unconscionable demand can be

sustained. On the face of it, such a demand is an appeal to despotic force. · A power that would indulge itself in the needless and indiscriminate destruction of those parts of a costly verdict in which there is no error, can be paralleled only by a power that would destroy an entire verdict without cause. The general principle of the correction of errors which occur in judicial proceedings, preserves, as far as possible, what is good and destroys only what is erroneous · when the latter can be severed from the former, and destroys no more of the good than is necessary in the process of ratification. But it may be that the defendant is entitled to a new trial as a matter of right. A new trial of what? Of those questions which have been rightly resolved against him? Of those questions in the trial and settlement of which no error was committed? Upon what principle of right, justice, logic or common sense can this immodest pretension rest? The whole claim is placed upon the false assumption that where there has been a mistrial of one issue, there must be a new trial as to all. The very object of a new trial is to correct the error which has been committed, and to this point it should be limited. The right of the plaintiff to preserve that which he has legitimately gained is as absolute and unassailable as the right of the defendant to recover that of which he has been wrongly deprived. The rights of the one should be no broader than those of the other. And in securing rights to one, those of the other should not be destroyed. But the counsel for the defendant will say this is the voice of innovation and revolution. No; it is the attuned note of the common law which has been sounded by great judges and courts for five hundred years. King's Bench and House of Lords have echoed and practiced it, and Lord C. J. DENMAN has declared that it is a matter of surprise that any one should ever (*Queen* v. *Willis*, 10 Cl.. & Fin. 534) question it. Massachusetts, New Hampshire, South Carolina, Iowa and other States have recognized and applied its doctrines; and indeed the cases in its support far exceed in number the volumes in the library of this court. Why then not apply it to this case? One reason alone is assigned.

It would be a surprise to the profession. This is indeed a poor tribute to their intelligence, for the rule is as well established as that in *Shelly's case*. See *Lisbon* v. *Lyman*, 49 N. H. 582, and the innumerable cases there cited.

Believing that the trial was had in conformity with the opinion first pronounced by this court, and that the court should not reverse itself in the same cause, I vote to affirm this judgment.

*Reversed.*