## BREED v. FIRST NATIONAL BANK OF CENTRAL CITY.

1. A mining superintendent, by virtue of his employment merely, has no authority to borrow money on the credit of his principal.

2. The power of an agent to draw on a principal's funds is entirely different from the more comprehensive power to draw on his *credit*. The former does not include the latter. Neither by note nor overdraft, can a mining superintendent, as such, bind his principal.

VOL. IV—61

3. Where an agent, without original authority, borrows money on behalf of his principal and uses it in a manner advantageous to the principal, the ratification of the agent's act may be inferred from the silence of the principal after knowledge of the facts.

4. It is the duty of the principal to repudiate the unauthorized act if he does not acquiesce in it, and, if he fail to do so within a reasonable time, the jury may infer a ratification, but no estoppel is created if the unauthorized action is complete before knowledge of it reaches the alleged principal, and the status of the parties would not be changed by his failure to approve or disapprove within a reasonable time.

*Appeal from District Court of Gilpin County.*

ASSUMPSIT.   Declaration on two notes to which the common counts were added.   Pleas, general issue and *non est factum* verified.   The notes described in the declaration were as follows:

"$3,000.00.          CENTRAL CITY, COL., *Feb.* 27, 1875.
One month after date we promise to pay to the First National Bank of Central City, or order, the sum of three thousand dollars, for value received, negotiable and payable without defalcation or discount, at their office in Central City, Colorado, with interest at the rate of one and one-half per cent per month from date until paid.

CARIBOU TUNNEL CO.,
By J. M. DAWLEY, *Supt.*"

"$317.96.          CENTRAL CITY, COL., *April* 1, 1875.
Fifteen days after date we promise to pay to the First National Bank of Central City, or order, the sum of three hundred and seventeen dollars and ninety-six cents, for value received, negotiable and payable without defalcation or discount, at their office in Central City, Colorado, with interest at the rate of one and one-half per cent per month from date until paid.

CARIBOU TUNNEL CO.,
By J. M. DAWLEY, *Supt.*"

There were two trials of this cause, the first resulting in a verdict for the plaintiff in $4,143.46.

Upon the second trial the bank had a verdict for the sum of $4,145, and judgment was rendered on the verdict. The defendant appealed.

The testimony of James M. Dawley, taken in the former trial, was read by agreement, as follows:

"I know Abel D. Breed; knew him in August, 1872, and had business transactions with him at that time; I commenced working the Caribou Tunnel August 16, 1872, and worked until April 16 or 17, 1875; it was in about 68 feet when I commenced; in August, 1872, I made a contract with Breed to run the tunnel; I run it under that contract until April, 1873; the tunnel was run to the Caribou mine, which Mr. Breed, I believe, owned at the time I commenced; in the latter part of April, 1873, Breed and myself threw up that contract; I was to keep on running the tunnel; he was to sell the tunnel and I was to have an interest in the sale; this was by mutual agreement between Breed and myself; he was very particular for me to keep it to myself and say nothing about it to any one; he told me the contract was in the little safe, and I could get it and destroy it; I was to run the tunnel as I had been doing previously and he was to furnish the money; I was getting a salary from the Mining Company Nederland, and he requested me to use what I could of that in the tunnel, and when he sold the mine he would remunerate me for what money I put in, and for my salary."

Defendant moved to strike out all of witness's testimony about the annulling of this contract. Overruled, and defendant then and there excepted.

"In April, 1874, I had a talk with Mr. Breed about the contract again; I could not find it in the little safe and told him I thought it must have been sent to Cincinnati; he told me when he went home he would look for it, and if found, he would cancel it or send it back to me; I told him he need not send it back, he could tear it up; I only wanted it destroyed; he said all right it should be destroyed and

never brought up again; I paid no more attention to the contract, supposing it destroyed.

After April, 1873, until April, 1875, I employed men and run the tunnel as I had been doing. Breed sent me money, or authorized Allen to draw money every month when my pay-rolls became due; Allen was in the employ of the Mining Company Nederland, and was Breed's confidential agent. After Allen left I forwarded every month's pay-roll to Breed on the first of the month, and he sent me a draft for the amount, which he continued to do until the last one, which I think was sent in June, 1873; at that time I had been working several months on some veins struck in the tunnel, and had taken out ore enough to pay expenses; the tunnel was completed to the mine some time in May, I believe. When Mr. Breed was out in the fall of 1874, he requested me to put some men in the tunnel beyond the Caribou mine which I did, also to work on the lodes; the lodes did not pay; Mr. Breed went away, and in December, 1874, I had no money to meet my November pay-roll; I wrote to Breed and sent amount of indebtedness of tunnel, and received no answer; I overdrew my account at the bank several hundred dollars to pay the men and wrote Breed respecting it, also telegraphed him, but received no reply. He had authorized me to keep the tunnel running; I talked to the men about it and they said they were not at all afraid to work for Breed; I kept the tunnel going until April 17, 1875, when Mr. Breed telegraphed me to stop work; Mr. Breed requested me to work the lodes, and I worked them under his direction; with the proceeds of the ore I paid the debts of the company; I sent Mr. Breed the pay-rolls or a monthly statement of the expenses; my first overdraft at the bank was in December, and amounted to $2,500.00; it was increased to $3,000.00, and April 27, 1875, when I received the telegram to stop work, $373 more to balance the account. Mr. Thatcher said the law did not allow him to have overdrafts, so I gave these notes in this form; I was not going to be responsible for Mr. Breed's

debts ; the account had been kept in the name of the Caribou Tunnel, so I made out these notes in that name and signed my own name by which I became responsible also. I paid the indebtedness of the Caribou Tunnel with money received from overdrafts ; I notified Mr. Breed of the overdraft but received no reply. During the time I worked the tunnel I received drafts from Mr. Breed, which were cashed at the First National Bank. In the fall of 1874 the account was ahead about $2,000.00 from the proceeds of working these mines. These lodes were all recorded in Mr. Breed's name ; he claimed them ; they were the Sherman and Poorman. The lode and tunnel accounts were kept together as one account."

The witness here identified the letters referred to in his testimony.

" About April 24, 1874, I received a draft from Mr. Breed, No. 329, for $700, on A. L. Scoville & Co., New York. I also received a draft previous to that for $1,200 ; the letters contained the drafts as stated, which were deposited with plaintiff, and the proceeds used for working the Caribou Tunnel ; none of the drafts or money were received by me as contractor ; they were paid to me in the capacity of superintendent of the tunnel."

*Cross-examination :* "The contract I spoke of was in writing signed by Breed ; (paper marked X handed to witness ;) I commenced work on the tunnel under this contract, and continued until the last of April, 1873 ; I then told Mr. Breed I could not run the tunnel under that contract after the Caribou mine was sold. He said : 'All right, we will cancel the contract, but I am going away and I want you to keep on running the tunnel ; I have entered into an arrangement with the Mining Company Nederland to run that tunnel to the Caribou mine, in consideration of the sale ; I will furnish you the money necessary to complete the tunnel.' I was in probably 350 to 400 feet ; up to this time I had only worked one

vein and that did not pay. On that day the contract was annulled, and after that I was running the tunnel as Mr. Breed's superintendent; I kept a bank account both before and after this time, always in my own name; so kept at Mr. Breed's request; I kept the accounts at the tunnel and the pay-rolls in the name of Caribou Tunnel; I signed my own name, J. M. Dawley, to the checks; the tunnel cut this vein thatp aid in August, 1873; I took out·ten or twelve thousand dollars; I put the proceeds in the First National Bank to my credit; my salary after the time the contract was given up was to be made all right when he sold the mine; he was to give me an interest in the sale of the tunnel; he told me not to·charge up any thing for salary, he would give me an interest in the sale; I took some money for my own expenses and charged it to myself on the books; cannot tell how much; I had nothing to do with the Mining Company Nederland so far as running the tunnel was concerned; I did not see the contract at that time and did not know its contents; all I knew was Mr. Breed made some kind of an arrangement for the company, to run out and meet me; I think, at Mr. Breed's request, I helped measure the work they did; I commenced sending Mr. Breed memorandum of indebtedness every month, in the fall of 1873 or spring of 1874; the checks which Mr. Allen drew were drawn on Mr. Breed's account at the First National Bank, and I deposited them in my name, and drew checks to pay the men and necessary expenses; I commenced in this way, and when the contract was annulled he requested me to continue to do so, and I did; after Mr. Allen went away in 1874 I had access to the safe; I worked the lodes up to the time I quit and rendered him a statement of what I took out; I claimed no interest in them; when I was $2,000 ahead Mr. Breed applied to me·for the money; I employed the men in the name of the Caribou Tunnel; in December, 1874, I notified Mr. Breed by mail and telegraph of the overdraft, and to send a draft or authorize me to draw; it was hew ho was overdrawn, but in my name; I was then running the

tunnel beyond the Caribou and working on two lodes; there was no arrangement for running the tunnel beyond the Caribou vein, only Mr. Breed went in there and told me to run it on beyond the Caribou, and I ran it about 84 feet; I quit all work when I received the telegram from him; the $2,500 note was taken up by giving another; I indorsed this note for forty days, and I made the other indorsements; I presume I was liable on the notes, I had no authority to sign Mr. Breed's name.

*Question.* He never gave you authority to borrow money, did he?

*Answer.* I do not know what you call it; I think I was authorized; I had to get money from some place; he authorized me to run the tunnel, and never authorized me to stop until he telegraphed.

I notified Mr. Breed I had executed these notes in name of Caribou Tunnel, in December, by letter, just as soon as I did it; I think it was June or July, 1874, that Mr. Breed sent me last draft; for three or four months after that I did not have to draw; made money enough out of the mine; Mr. Breed did not answer the letter; did not hear from him from that time to this, and did not see him until yesterday.

At the time I commenced this account on which suit is brought, at the bank, I explained to them my relation to Mr. Breed; they understood this money was used on Mr. Breed's account as well as I did; Mr. Breed knew I kept the account in my own name, and knew this when the account was $2,000 ahead; he wanted me to draw him a check for it; he claimed it as his; I told him the tunnel was not working well and it would be best to leave it as I might have to draw on him for it back next month.

I think I gave the bank a note in July, 1874, for $400 for an overdraft, which was paid by check on my account; that note was signed individually, J. M. Dawley; that was the only note I ever gave them except these; the one signed Caribou Tunnel Company—I should have left the *company* off."

Witness recalled for plaintiff in rebuttal:

"I heard Mr. Breed's testimony in reference to the Nederland contract; I knew such a contract was in existence from the time it was made; Mr. Breed told me he had a contract with the company to meet me; I did not have any interest in the contract that I know of; did not know my name was mentioned in it; Mr. Breed never had any settlement with me about that contract; did not consult me about making it; he did not make a verbal arrangement with me to run the tunnel beyond the Caribou; I never had such a conversation with him about it; there was no agreement by which I was to run the tunnel beyond the Caribou at so much per foot; I run it as superintendent for him at his expense."

Cross-examination:

"*Question.* You say you never saw the contract with the Nederland Company?

*Answer.* I never saw it; never knew my name was connected with it.

*Question.* Never knew about the amount paid?

*Answer.* I might have known it.

*Question.* Had nothing to do with paying the amount? Whose handwriting is that? (Paper marked Z handed witness.)

*Answer.* That is mine.

*Question.* Read it and see what it is, it is all in your handwriting?

*Answer.* Yes, sir; this letter is in my handwriting, and this statement, which was inclosed; all done at Mr. Breed's request; I got the entries on this sheet from the book in the safe; I made the entries at the time they are dated, I presume; they were probably handed me on a slip by Mr. Breed; on the 13th day of October, 1874, I wrote to Scoville & Co.: 'Gents.: Inclosed find statement of the journal and cash-book entries made since last statement sent you by Mr. Breed;' that refers to this sheet, and was at

Mr. Breed's request; I entered on the journal at the date of it, 'The Caribou Tunnel to J. M. Dawley, for running tunnel, March and April, since last measurement, 16 feet at $18 per foot, $228; also, running 2d, 94 feet at $20; the above completes contract to the Caribou tunnel.'   Mr. Breed requested me to keep the tunnel running as I had done; so far as I was concerned the contract was annulled; I made the entry 'James M. Dawley to Mining Co., Nederland, for running tunnel from Caribou mine to intersection with Dawley, 80 ft. 5 in. at $28 per foot;' I made it out that way by Mr. Breed's instructions, and sent Scoville & Co. a copy; I was keeping the books, and did it just as he instructed me."

J. A. Thatcher testified: "I am president of the First National Bank of Central City, and have been since it was organized; had business transactions with Dawley in 1873, and for a long time previous; in the fall of 1874 he was running the Caribou tunnel; his business was active; drawing and receiving remittances from Breed; depositing them and conducting mining business as is usually done by agents; the last draft, I think, came from Breed in June, 1874, for about $1,400; after that time up to December 22, Dawley was working the mines crossing the tunnel, and met his current expenses; our first advance to Dawley in December was $2,500; we authorized him to check for it; I told him we could not allow an overdraft, and he executed a note at my request; we let him have $500 more later in that winter; after that some more; the total was $3,316; it was paid out in small checks to the workmen; no check larger than $100 unless it was to some merchant; sometime about November 1, 1874, I had a conversation with Breed about our transactions with Dawley; Dawley's account was then good; I took Mr. Breed into the back room; he asked me to show him Dawley's account, and how it was kept, and its condition as to debits and credits, and how he stood at that time; I showed it to him and he expressed his gratification to me, and asked me as to Mr.

Dawley's habits, and whether he was conducting his business right in my judgment; I told him we kept the account in Dawley's name, as Dawley said he had requested that it should be kept in that way; I cannot say what Mr. Breed's answer was to that; in the early part of that year Dawley told us that the contract between them had been thrown up; said Breed requested him to keep the account in his own name; we transacted a great deal of business with Breed personally; he had his personal account there; he knew we kept that account as we did; I showed him the account and the amount Dawley's account was good for at that time; he seemed gratified and mentioned the amount, about $1,900; he examined the account and spoke of it as his own; the checks paid were placed to his, Dawley's, debit, and Breed's drafts were placed to his credit."

*Cross-examination:* "He commenced business with us as Thatcher, Standley & Co., in 1872, simply as J. M. Dawley; I think he overdrew $300 or $400 in 1872, which I think was paid by Mr. Breed's check or draft; we made him the loan of $2,500; that is, we agreed upon that amount he could use; it was paid out on checks to workmen and merchants, none to Dawley himself; we paid the checks as made and did not inquire who they went to; the first note was made by Mr. Dawley, December 22, 1874, and credited to his account that day; I asked Dawley very particularly for what purpose he wanted the money; the note was for $2,500, due in forty days, and it was expected and represented by Dawley that Breed would return by that time and make it good; this note was renewed for thirty days, and we let him have $500 more; at the end of the thirty days we took his note for $3,000; he said it was Breed's affair all the time, therefore I did not look to anybody but Breed for payment; he did not have authority to sign Breed's name to the note; every thing was done in the name of Dawley."

*Re-direct examination:* "After the debt was contracted

I wrote Mr. Breed about it, but got no answer; the first letter was written at my house and I have no copy of it; to the best of my knowledge it was deposited in the mail; we had great trouble in finding Mr. Breed; he was supposed to be in Cincinnati, or a letter would be forwarded to him from there, and we only wrote to him there; I used a return envelope, and the letter never came back; I wrote a telegram for Mr. Dawley, and think I signed it with him; we tried to find Mr. Breed; he was in the interior of California, and could not be reached; the telegram was sent to San Francisco, but he was then in the Pleasant Valley mining region; it was sent within two or three days after Dawlay got the money, and stated exactly what he had done; that he got this money from me to pay this pay-roll, stating the amount; we received no reply; after several days the message was repeated; the second letter was written October 12, 1875." Copy read as follows:

"Central City, *October* 12, 1875.

Mr. A. D. Breed, Cincinnati, Ohio:

Dear Sir—We had expected to see you here long before this, and now learn that you are east. I wrote you to request you to settle up our debt against the Caribou Tunnel Company, created by Mr. Dawley. It is a fair, honorable and just debt, and I trust you will not compel us to wait longer on this matter. The debt was created in the name of the 'C. T. Co.' by Mr. Dawley, sup't, and whatever the differences between yourself and Mr. D., it should not work an injury to us in delaying the matter. Please reply at once to this.

'Yours, very truly,

J. A. Thatcher, *President.*"

"These are the notes (notes sued on shown to witness).

I do not know where Dawley is now; at the time of the loan he was not worth any thing, and that was the reason I loaned the money to Breed."

Richard Crow sworn, and testified : "I reside in Nederland; have known Mr. Breed since 1871; I was in his employ from 1871 until he quit working the Caribou tunnel in the spring of 1875 ; I was hauling quartz and wood ; hauled from the Sherman and Poorman ; I knew James M. Dawley ; he was working the mines and driving the tunnel ; he commenced running the tunnel south of the Caribou lode sometime in the fall of 1874; Mr. Breed was out here two or three times, and always spoke to me as if the was interested in running the tunnel ; I heard him say regarding the lodes that he had three-fourths of the net proceeds ; the Sherman and Poorman lodes were owned in New York, I believe ; Mr. Breed worked them right along as if he had a right to.

Mr. Breed claimed 250 feet on each side of the tunnel on the lodes crossed by it ; the Sherman is an old discovery, and the Poorman was discovered before the Caribou ; Dawley was working on these lodes about 200 feet below the surface, and there was no connection with the surface, but it was afterward proven to be on these lodes ; I was paid for my work at the tunnel by check on the First National Bank, signed by James M. Dawley."

Clarence A. Sherwood sworn, and testified: "I reside at Caribou, and am engaged in mining; have been acquainted with Mr. Breed since 1871; I worked for him over three years, at the Nederland mill twenty-two months, and then at the Caribou tunnel and lodes struck in tunnel; I understood I was working in the tunnel for Mr. Breed. Mr. Dawley paid me by check on the First National Bank. Mr. Dawley employed me to do that work ; I commenced in April or May, 1873, and worked both north and south of he Caribou."

J. A. Thatcher, recalled : "This claim with interest at ten per cent per annum amounts to-day to $4,145."

Plaintiff rested.

Defendant read in evidence the deposition of Abel D. Breed, as follows :

"My name is Abel D. Breed ; sixty-six years of age ; a manufacturer by occupation ; I know the plaintiff; I am defendant; I have known James M. Dawley, since 1872 ; he has been in my employ; my first business transaction with said Dawley was in form of a contract on the 3d day of August, 1872, a copy of which is hereto attached (same as offered in evidence and marked X).   On or about September 1st, 1872, I employed him as foreman of my mill at Middle Boulder; the said Dawley was never employed by me as my agent; he was employed by me both in the capacity of hired laborer and contractor, but never as an agent. He contracted to drive the Caribou tunnel for me according to the provisions of the contract referred to above (marked X) ; the original contract is in the hands of my attorneys, H. M. & W. Teller of Central City, Colorado ; I knew the Mining Company Nederland in 1873 ; I made a contract in writing with said company in 1873, a copy of which is hereto attached (same as offered in evidence and marked Y), the original of which is now in the hands of my attorneys H. M. & W. Teller, Central City, Colorado ; I made but one contract with this company; this contract provided for the running of a tunnel from the Caribou mine to meet the tunnel being run by Dawley; Mr. Dawley knew of the making of the contract with the Mining Company Nederland and he assented thereto, and was very anxious to have the contract made, as he believed the tunnel, if driven by said company, would intersect rich veins in the course of its progress by which he would be much benefited financially, as provided for in the contract (marked X).

Said contract (X) with James M. Dawley has never been canceled or annulled ; I never at any time or in any place agreed to destroy this contract, nor told Dawley it should be destroyed, nor that the contract was at an end, discharged or canceled ; Dawley completed the tunnel as per contract (X) I believe, in the latter part of 1874, and I paid Dawley

in full according to the terms of the contract on or before the completion of the same; Dawley contracted and agreed with me to extend the Caribou tunnel one hundred feet south of the Caribou mine; the price per foot to be paid said Dawley for the driving of said tunnel was not to exceed thirty dollars; this agreement was entered into in the latter part of 1873 or the early part of 1874; Dawley was never authorized or empowered by me in any manner or form whatever to employ men for me to work on the Caribou tunnel either north or south of the Caribou lode, and in no instance did I ever authorize him to incur any indebtedness for such work, or for any work on such lodes connected with the Caribou tunnel or the Caribou lode; I have paid Dawley in full and the entire amount due him for the work done on the said Caribou tunnel south of the Caribou lode; I paid this money in installments at different intervals of the work in checks and drafts; I never did business under the name of the Caribou Tunnel or the Caribou Tunnel Company, and never knew of any business being transacted under either of these names; I never authorized or empowered James M. Dawley to do business for me under such name or names; I first learned that Dawley assumed or claimed that he could bind me under such name or names in the latter part of 1875; I had a conversation with Frank C. Young, cashier of plaintiff, in New York in 1875, in respect to the notes sued on in this case. In my conversation with Mr. Young I emphatically informed him that Dawley had no authority whatever to give the notes now sued on, and that I was not legally or morally responsible for the same. Mr. Young informed me the bank would sue for the payment of the notes; I never requested James M. Dawley to keep the account of the work done on the Caribou tunnel or lodes connected therewith in the name of the Caribou Tunnel or the Caribou Tunnel Company, and I never made any suggestions whatever as to how he should keep his accounts; I heard James M. Dawley testify in the Boulder county

district court in July, 1876; I requested Dawley to send accounts monthly to A. L. Scovill & Co., showing all money he had received from me or from said A. L. Scovill & Co.; I never promised to pay the notes sued on in this case or the amount thereof, or any amount whatever included in these notes; I knew David B. Miller; he was in Colorado in July, 1875, to render assistance to my attorneys; he had no authority from me whatever to incur any indebtedness due or claimed to be due from me; I heard my letter read in the Boulder county district court relative to recording lodes struck in the tunnel, whether known or not.; I gave these instructions to Mr. Dawley in accordance with the law of Colorado governing the ownership of lodes struck in driving tunnels. I have banked with the plaintiff in this suit, and with the plaintiff's predecessors, Thatcher, Standley & Co., having had money deposited with them over three years; I had money on deposit with plaintiff to my credit during the fall of 1875; my balance during that period being about five hundred dollars; this money was drawn out by D. B. Miller about the 22d day of July, 1876, on an order from me; I think I first learned that plaintiff was claiming an indebtedness against me in the latter part of 1875; cannot state from whom I learned it; I was not in anywise indebted to James M. Dawley in December, 1874, or at the time of the date of the notes sued on for work done on the Caribou tunnel, or on any lodes worked by Dawley, in connection with said tunnel, nor was I indebted to him on any matter whatever; the payment of the $1,700 by me to the said James M. Dawley, in May, 1875, was subject to my contract with Dawley, and any other money which I may have paid him about that time was likewise paid on account of the contract; I did not know at that time that Dawley claimed to be my agent; I had no knowledge of the execution of the note sued in this case, and I had no knowledge whatever of any claim of the plaintiff upon me for any money advanced by it to James M. Dawley; Dawley did work on the lode cut by the tunnel, after said tunnel had reached the Caribou lode;

Dawley claimed his proportion of the net profits of work ing said lodes during the time he was working on the tunnel south of the Caribou lode; the same as he had before the tunnel had reached the Caribou lode; Dawley claimed the right to such net profits under the contract hereto annexed (marked X); James M. Dawley was never at any time authorized or empowered by me in any manner or for any purpose to contract any indebtedness, or to employ any men to work for me, or to make any settlement or statement of account with any one for me; he was not authorized to keep any account of mine with any bank or bankers, or to give any instrument in writing that could bind me in my name, or in any other name; I was first informed of Dawley claiming so to do in the latter part of the year 1875; I did repudiate such claims and wrote Dawley to that effect at once; I am acquainted with Joseph A. Thatcher; I have no recollection of having any conversation with Mr. Thatcher in reference to this claim; in the year 1873, in a conversation with Mr. Thatcher, he inquired of me very particularly regarding the financial responsibility of James M. Dawley, remarking at the same time that Dawley was indebted to his bank in the sum of $2,000, or more; in answer to his questions regarding the financial standing of Dawley, I replied that I could not inform him as to Dawley's responsibility financially."

*Cross-examination:* "Dawley was to run the Caribou tunnel under the first contract until it cut the Caribou lode; I paid Dawley at different intervals during the progress of the work, in drafts, currency and checks, upwards of twenty-six thousand ($26,000) dollars; I employed Dawley to run the tunnel south of the Caribou lode, in the autumn of 1874; he run this tunnel about 80 feet; at the time of the completion of the first contract, to run the Caribou tunnel, Dawley was personally indebted to me for several thousand dollars, which I had advanced him over and above the money actually due him; by the provisions of the contract a portion of this money owed me by Dawley was applied

as payments on the second contract; in addition to this I made payments of money to Dawley in the spring of 1875 at the time Dawley had driven the tunnel 80 feet south of the Caribou lode; he was indebted to me in the sum of over $10,000 for over-payments in the contracts in drafts and checks; I knew of the work done by Dawley on the Caribou tunnel, and lodes cut by said tunnel at t he time it was progressing; this work was to be paid for according to the terms of the contract; do not recollect of ever having received a letter from Joseph A. Thatcher on the subject of the claim of plaintiff, and do not recollect writing him on that subject; I admitted during the trial of the case of Clarence A. Sherwood against me in the U. S. district court, at Denver, on or about 2d day of August, 1877, that Dawley and myself were to share the profits of working the lodes cut by said tunnel, I to have three-fourths and Dawley to have one-fourth interest, and if there were losses, we would share it in like proportion; not that I was under any legal obligation to Dawley to share in the losses, but taking into consideration his indebtedness to me, I was willing to deal leniently with him in his losses.

(Signed,)                         ABEL D. BREED."

Defendant offered in evidence the contract above referred to between Abel D. Breed and James M. Dawley marked X, as follows:

"This agreement made and entered into this third (3d) day of August, A. D. 1872, between James M. Dawley, party of the first part, and Abel D Breed, party of the second part, witnesseth: That for and in consideration of the payments, agreements and stipulations hereinafter to be specified, the said party of the first part agrees and covenants with the said party of the second part to drive the Caribou tunnel (so called), owned by said Breed, from its present face (about seventy-five feet from its entrance) until it cuts the Caribou lode, whatever the distance may be; to construct said tunnel of the following dimensions, viz.: To

be seven (7) feet high in the center, to be six (6) feet high on each wall from the bottom to the turn of the arch, the said arch to be sprung for a tunnel eight (8) feet wide, and the width of said tunnel to be five (5) feet in the clear.

The said party of the first part further agrees to devote his time and energies to the prosecution of the work so as to complete said tunnel to the Caribou lode at the earliest practical period of time. He also agrees not to claim any lodes discovered or struck in said tunnel, but to notify said Breed or his agent of the striking of such lodes as may be found, at his first opportunity, that they may be recorded.

He also agrees not to claim or remove any ore from the Caribou lode, by virtue of this agreement.

In consideration of the above covenant and agreements the said party of the second part agrees to and with the said party of the first part to pay him for running the aforesaid tunnel to the Caribou lode, the following prices per ft., viz.: For the first one hundred (100) ft. from the present face of the tunnel, five ($5.00) dollars per foot. For the second one hundred (100) feet, seven ($7.00) dollars per foot. For the third (3d) one hundred (100) feet, nine ($9.00) per foot. For the fourth (4th) one hundred (100) feet, eleven ($11.00) per foot. For the fifth (5th) one hundred (100) feet, fourteen ($14.00) per foot. For the sixth (6th) one hundred (100) feet, eighteen ($18.00) per foot. For the seventh (7th) one hundred (100) feet, or for so many feet as may be found to remain between a point six hundred (600) feet from the present face of the tunnel and the Caribou lode, twenty dollars ($20.00) per foot. The said party of the second part further agrees to furnish lumber for a track, a car for removing the ore and waste rock, and also such appliances and power as may be found requisite to drive air into the tunnel, whenever artificial ventilation becomes necessary. The said party of the second part further agrees that the said Dawley shall have one-fourth ($\frac{1}{4}$) of the net profits on all ore he may extract from each and all of the veins or lodes he may strike in the prosecution of the work for a

period of twelve months from the date of striking such lodes. It is further mutually agreed and understood that during the joint occupation and use of said tunnel and track for the removal of ore, that neither party shall have the preference, but that the arrangements shall be equitable and fair.

" In testimony whereof we have set our names and affixed our seals, on the day and the year first above written.

J. M. DAWLEY, [L. S.]

Witness:    .    A. D. BREED,    [L. S.]"

SAM'L CUSHMAN.

[Int. Rev. 6c.]

Plaintiff objected to the admission of the same, " because it is irrelevant; applies to work done north of the Caribou lode, and before the incurring of the indebtedness, and had nothing to do with any work south of the Caribou lode, and can have nothing to do with this case."

The court sustained the objection, and defendant excepted.

Defendant offered in evidence the article of agreement between Abel D. Breed and the Mining Company Nederland, (marked Y), as follows:

·"This article of agreement made by and between Abel D. Breed, of the city of Cincinnati, of the first part, and the Mining Company Nederland of the second part, witnesseth: That the said party of the first part being desirous to insure the completion of the Caribou tunnel, located in Boulder county, Colorado, at the earliest possible moment, hereby agrees and binds himself to pay to the said Mining Company Nederland, the actual cost of finishing said tunnel from the point in the Caribou mine that it may be on the 1st day of January, 1874, until it intersects the tunnel now being driven by Mr. Dawley from the valley. In consideration of said payment, the said party of the second part does hereby agree to procure the said work to be done at the lowest possible price, and will furnish such supplies as

they may have and as may be required for said work at cost. They further agree to give the use of their engine and hoisting machinery, when the same can be used for said work, and hoist all stuff taken from the tunnel free of cost; and that their chief agent or such person as he may designate will superintend the construction of the said tunnel free of any charge to said party of the first part, and as it is agreed by the party of the second part to commence the work on said tunnel from the mine to its face, and if in such case on account of improper location the tunnel should not connect with the portion now constructed, then the said connection between the two parts is to be made at the sole expense of the party of the second part. Whereas, the said party of the first part has already made a contract with J. M. Dawley to complete said tunnel, and whereas he does not desire in any manner to interfere with him in the execution of the same, he hereby agrees with the party of the second part that they can make any agreement with said Dawley that they mutually agree upon, and in the event of such contract being made, the party of the first part binds himself to pay to said party of the second part, whatever price the said Dawley may agree to pay to the said party of the second part for the completion of the tunnel which, however, is in no event to exceed more than it actually cost the party of the second part to complete the said work; but in the event that the price agreed on between the said Dawley and said party of the second part should not be sufficient to repay the party of the second part, to complete the said tunnel in the manner heretofore described, the party of the first part hereby agrees also to pay such sum as may be the difference between the amounts agreed upon by said Dawley and the actual cost of the work. For the purpose of avoiding disputes as to the actual amount of the cost of said work, it is hereby agreed by and between both parties to this agreement, that the statement of cost made in writing and certified to as being correct by P. H. Van Diest, Esq., the chief agent of the Mining Company Nederland, shall be

conclusive as to the cost, and the said party of the first part agrees to pay the same on demand of the second party to this agreement. In the event that the agreement made between said Dawley and the party of the second part should allow them more than the actual cost to run the said tunnel, then the said parties of the second part agree to repay to said Dawley the amount of said excess.

In witness whereof our hands and signatures, this the 19th day of December, 1873.

A. D. BREED. ·    [L. S.]

For Mining Company Nederland.

Witness :                          P. H. VAN DIEST,    [L. S.]
WM. F. ALLEN.                                    *Agent."*

Plaintiff objected thereto for the following reasons :

" It is irrelevant ; applies to work north of the Caribou lode, and before the incurring of the indebtedness, and has nothing to do with any work south of the Caribou lode, and can have nothing to do with this case. This article of agreement is between A. D. Breed and the Mining Company Nederland, and refers to work done north of the Caribou lode, and before the tunnel cut the lode."

Objection sustained by the court, and the defendant excepted.

Defendant offered in evidence the letter referred to by witness Dawley, and statement inclosed therewith, from J. M. Dawley to A. L. Scoville & Co., (marked Z) as follows :

CARIBOU, *Oct. 13th, A. D.* 1874.

A. L. SCOVILLE & Co., Gents :

Inclosed find statement of journal and cash book entries made here since last statement sent you by Mr. Breed ; also map of Caribou tunnel which Mr. Breed forgot to take. Please hand it to him on his arrival. The tunnel is looking splendid. Please acknowledge the receipt of papers and oblige,          Yours respectfully,

J. M. DAWLEY."

Journal entries since last statement made March 5, 1874.
"Oct. 12.

| | | |
|---|---|---|
| Caribou Tunnel, | $2,168 00 | |
| To J. M. Dawley, | | $2,168 00 |

For running tunnel March and April and
since last measurement, 16 ft. @ $18.00
per foot,                                                              288 00

Also running tunnel  94 ft. @ $20.00 per
foot,                                                                   1,880 00

The above completes the contract to the Caribou Tunnel.

| | | |
|---|---|---|
| Oct. 13.   J. M. Dawley, | $2,251 66 | |
| To Mining Co. Nederland, | | $2,251 66 |

For running tunnel from Caribou mine to intersection
with Dawley, 80 ft. 5 in. @ $28.00 per foot."

Defendant rested.

Plaintiff, in rebuttal.  J. A. Thatcher recalled and testified
as follows :

"I heard the deposition of A. D. Breed read; I do not
recollect of having any conversation with him about Daw-
ley's financial condition in 1874 ; I never stated to him that
Dawley was indebted to the bank in the sum of $2,000 ;
Dawley was never indebted to the bank in the sum of
$2,000 ; at one time he owed the personal debt as I testified
to ; $400 or $500 I think ; that was a year before this debt;
he gave his own personal note and paid it."

Which was all the evidence introduced on the trial of
said cause.

The instruction numbered thirteen and referred to in the
opinion was as follows : "The court instructs the jury that
the employment of a person as agent to do work in a tun-
nel or mine does not authorize such person to borrow
money for the purpose of carrying on the work or to pay
for work already done by him, and unless plaintiff has
shown authority other than that of Dawley's employment,
to borrow the money for which suit is brought, then plain-
tiff cannot recover in this action."

Messrs. H. M. & W. TELLER, for appellant.

Messrs. BELFORD & REED, for appellee.

THATCHER, C. J.   Evidence was introduced by plaintiff tending to show that Dawley during and after the spring of 1873 acted as agent or superintendent of Breed; that he continued so to act until and at the time he borrowed money from the bank, for the recovery of which this suit was brought.   The contract between Dawley and Breed, if introduced in evidence, would have tended to show that at the time it was entered into, and so long as it remained in force, Dawley was a contractor, and not a superintendent or agent.   If the terms of the contract were by verbal agreement, as Breed testifies, made also to apply to the construction of the tunnel *south* of the Caribou lode, except so far as related to the price per foot to be paid by Breed, the agreement itself furnishes the best evidence of the relation that existed between him and Dawley, and tends to show that the southern extension of the tunnel was constructed by Dawley as a contractor.   There is also evidence that in the spring of 1873, the written contract between Dawley and Breed was, by mutual consent, rescinded, and that thereafter Dawley acted as superintendent.   These controverted questions of fact touching the nature of the agreement between Breed and Dawley, during and after the spring of 1873, until the autumn of 1874, and the nature of the agreement thereafter under which the tunnel was extended south, were properly questions for the jury, in the resolution of which they might be aided by reference to the original contract which should have been admitted in evidence.   The course of Dawley's dealing with Breed from which Dawley's agency might be inferred, was before the jury.   As tending to repel such an inference, at least, so far as relates to the tunnel north of the lode, the August contract was admissible.   Nor is it entirely clear from the evidence whether the amount of the overdraft was paid out on account of work in the tunnel north or south of the lode.

If paid out on work north of the lode, and under the August contract, the question as to whether it inured to the ultimate benefit and use of Breed would not ordinarily be material; for in such case Breed, if he had learned of the loan and expenditure, could not, by silence, be construed to have ratified Dawley's act in securing it. His only duty would have been to respond to Dawley for work on the tunnel at so much per foot according to the contract. It could not properly be said in such case that the money was expended for Breed's use, but for the use of Dawley. There is some evidence tending to show that the contract between Mining Company Nederland and Breed was entered into with the knowledge and consent of Dawley, and that he (Dawley) did work in pursuance of its provisions.

This contract tended, in connection with other evidence, to impeach Dawley's testimony concerning the annulment of the former agreement. The court, we think, erroneously excluded it. With a view to determine Dawley's status, both written contracts should have been considered in the light of all the evidence.

If Dawley was by Breed appointed mining superintendent, to oversee and direct the construction of the Caribou tunnel, either north or south of the lode, with authority to employ men to work in the tunnel and operate the mines that might be found therein; if further, from time to time Breed furnished money to Dawley to pay the employees, and Dawley placed such money to his individual credit at the bank, checking out the same as it was needed to pay the laborers, was he, by virtue of his employment as such mining superintendent, in the absence of any special authority in that behalf, authorized to borrow money to enable him to prosecute the work in the tunnel, or to pay for work already done therein, and bind his principal to its payment?

If it be conceded that although the bank account stood in the name of Dawley it was in fact Breed's account, kept in Dawley's name, by agreement of parties, and that Daw-

ley had authority to draw thereon, it does not follow that he was authorized to *borrow* money from the bank on account of his principal. Even if he had been acting under a general power of attorney to draw checks or drafts in the name of his principal, he would have no authority, under such power, to make an overdraft, which is one form of borrowing money from the bank. *The Union Bank* v. *Mott*, 39 Barb. 180.

The giving of the following instruction is assigned for error:

"The court instructs the jury that if they believe, from the evidence, that Dawley was the agent of Breed, in the work of employing and superintending men at work upon the lodes and the tunnel, and that Dawley was not running the tunnel south of the Caribou lode at so much per foot, but that he was employing the men and incurring the expense incident thereto, with Breed's knowledge and consent, and that the men were at work for Breed, and that Breed requested Dawley to keep the bank account in Dawley's name instead of Breed's, and that that was the reason that Dawley kept the account in his own name, that really belonged to Breed, then you may, under the law, find that Dawley had implied power *to overdraw*, to pay those men and other necessary expenses."

That a mining superintendent, by virtue of his employment as such, has the power to borrow money in the name of his principal, in the absence of express authority or authority which must necessarily be inferred to exist from the course of dealing between himself and his principal, is a doctrine which we cannot sanction.

All the hypotheses enumerated in the instruction may co-exist, and still the principal not be liable. The power of an agent to draw on a principal's funds is entirely different from the more comprehensive power to draw on his credit. The former does not include the latter. The superintendent may have the authority to employ men to prosecute the work; if so, and funds be not furnished, the

principal, and not the superintendent, is liable to the work-. men. The superintendent is not authorized to exercise a power not conferred, by entering into a contract with third persons for the loan of money with which to discharge even the lawful debts of his principal. Had there been previous overdrafts to the knowledge of his principal which he had subsequently paid, a just deduction might be drawn as to Dawley's authority to borrow by way of overdraft. But this view of the case is not presented by the instruction, nor do we think the evidence would justify it. Neither by note nor overdraft on a bank, can a mining superintendent, as such, bind his principal.

In the case of *New York Iron Mine* v. *First National Bank of Negaunnee*, Albany Law Journal of 1878, p. 489 (not yet reported in the published opinions), the supreme court of Michigan very fully considered the question as to whether a general mining agent, without being specially empowered so to do, has authority to make a promissory note in the name of his principal. The court denied the authority, holding that the owner of the note could not rest its case on the implied power of the general agent; that the issuing of promissory notes is not a power necessarily incident to the conduct of the business of mining, and that it is so susceptible of abuse to the injury, and indeed to the utter destruction of the principal, that it is wisely left by the law to be conferred or not as the prudence of the principal may determine.

In *McCullough* v. *Moss*, 5 Denio, 567, it was held that the president and secretary of a mining corporation could not bind the corporation by a note made in its name, without proof of their authority to execute it.

In *Union Gold Mining Co.* v. *Rocky Mountain National Bank*, 2 Col. 248 and 565, the court held that the superintendent of a mining company has no authority, by virtue of his office merely, to borrow money on the credit of the corporation by note, overdraft or otherwise. We discover no sufficient reason for departing from what may be consid-

ered as the settled doctrine in this State on this subject. We must conclude that the instruction under consideration, as it is not in harmony with the views here expressed, was liable to mislead the jury as to the law of the case, and, therefore, was erroneously given. This instruction is inconsistent with instruction numbered thirteen.

Whether Breed, by his course of dealing with Dawley, held him out to the world as an agent, authorized to borrow money to carry on mining operations, is a question which, upon all the facts, is for the jury, and upon which we now express no opinion.

If Dawley was without original authority to borrow money on behalf of his principal, but did in fact so borrow, and used it in a manner advantageous to the party to be charged, the ratification of his unauthorized act may be inferred from the silence of the principal after knowledge of the facts. It is his duty, if he does not acquiesce in the unauthorized act, to repudiate it. If he fail to do so within a reasonable time after notice, the jury may draw an inference of ratification, but no estoppel is created if the unauthorized transaction is complete before knowledge of it reaches the alleged principal, and the status of the parties would not be changed by his failure to approve or disapprove within a reasonable time. *Union Gold Mining Co.* v. *Rocky Mountain National Bank*, 2 Col. 248. Judgment

*Reversed.*